**INTERNATIONAL INSURANCE CO., a corporation, Plaintiff–Appellant,**

v.

**Alfred M. JOHNS, James W. McFadden, Thomas V. Ogletree, Richard W. Sherman, and G. Paul Whorton, Defendants–Appellees.**

No. 88–5530.

United States Court of Appeals, Eleventh Circuit.

June 7, 1989.

1448

Bruce G. Hermelee, Hermelee, Coward & Minkin, P.A., Todd A. Cowart, Miami, Fla., for plaintiff-appellant.

Lewis R. Mills, Audrey G. Fleissig, St. Louis, Mo., Jerome A. Pivnik, Miami, Fla., for defendants-appellees.

Before VANCE and COX, Circuit Judges, and KING *, Chief District Judge.

JAMES LAWRENCE KING, Chief District Judge:

In this appeal we examine golden parachutes [1] and corporate control from an insurance law perspective. A Florida corporation's board of directors adopted golden parachutes for several key executives. After change in corporate control opened the parachutes, a disgruntled shareholder instituted a derivative action, alleging that the parachute payments were corporate waste. The directors settled the action, and sought payment for this compromise under their corporate liability insurance policy. The insurance company denied coverage and filed this declaratory action to justify its refusal to honor the claim. After a three-day trial, the district court found coverage. 685 F.Supp. 1230. We now affirm.

## FACTS

Southwest Florida Banks, Inc. ("Southwest") was incorporated under the laws of Florida in 1972. From 1972 until 1975, the bank assembled a management group which included the appellees.[2] Under this management, Southwest experienced substantial financial growth and rapid expansion. The consolidated total assets of Southwest grew from $226 million in 1972 to $1.4 billion in 1982. The net income of the company also increased from $1.9 million in 1972 to $14.2 million in 1982.[3]

As a result of this growth, Southwest became an attractive takeover target by the end of 1982. The First Boston Corporation ("First Boston"), Southwest's investment banker, informed the management group late in 1982 that the bank easily could be acquired. First Boston told the board that a large amount of Southwest's common stock was held by institutions that were likely to approve a change in management for modest improvements in earnings. First Boston also informed Southwest's management that a recent substantial increase in the number of banking acquisitions had occurred.

A number of key officers and employees expressed considerable concern about the likelihood and consequences of a merger. Southwest's previous executive bonus sys-

---

* Honorable James Lawrence King, Chief U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Golden parachutes are essentially termination agreements providing "substantial bonuses and other benefits for managers and certain directors upon a change in control in a company." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 178 n. 5 (Del.1986); *see also Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 4 n. 2, 105 S.Ct. 2458, 2460 n. 2, 86 L.Ed.2d 1 (1985).

2. The appellees are Alfred M. Johns, former chairman and chief executive officer of Southwest; Richard W. Sherman, former president and chief operating officer; Thomas V. Ogletree, former treasurer and chief financial officer; James W. McFadden, former chairman of the finance committee and president of the First National Bank in Fort Myers, Florida, and G. Paul Whorton, Mr. Sherman's principal assistant.

3. In 1983, however, Southwest's net income declined to $12,200,000.

tem had expired. Southwest's board of directors adopted this plan, linking bonuses to earnings per share, for key executives in 1977. These executives remained with the company during the five years this plan was in operation. Southwest's management believed that if the same executives were to remain in the future, a new compensation system was needed.

On March 21, 1983, Southwest's board of directors established the Performance Incentive Plan ("PIP").[4] PIP provided for the creation of 400,000 units, each valued at $10.00. Payment of the dollar value of the units would be made to the participants five years after the award of the units, or immediately if a change in the control of Southwest occurred. A specially appointed committee of three directors ("PIP Committee") was to administer PIP by awarding units to the chairman of the board, and recommending to the chairman the other recipients. Only officers and full-time employees of Southwest or its subsidiaries were eligible for PIP payments.

PIP's stated purpose was to induce uniquely important officers and management employees of the company to remain in its employ during the critical next five years. To accomplish this purpose, PIP was to minimize their concerns about the impact a potential acquisition would have on their future employment. Accordingly, PIP offered "additional, but contingent and deferred compensation.[5]

The board adopted PIP by unanimous vote on July 20, 1983, with all fifteen directors voting. Of these fifteen, only three board members were eligible and actual recipients under PIP. The other directors were not eligible because they were not officers or employees of Southwest or its subsidiaries. Although the board believed

a merger was probable within the next five years, no particular merger was contemplated when the board voted.

The PIP Committee[6] recommended the following awards: appellees Johns and Sherman were to receive 100,000 units each; appellee McFadden was to receive 50,000 units; appellees Ogletree and Whorton were to be awarded 40,000 units each.[7] Johns, the chairman, made all the recommended awards.

On October 25, 1983, Southwest approved, subject to regulatory and shareholder approvals, a merger of Southwest into Landmark Banking Corporation of Florida ("Landmark"). A key provision of this merger agreement, approved by the board of directors of both Southwest and Landmark, authorized Southwest to enter into a consulting agreement with its former chairman, Johns. The contract provided for a five-year term with annual compensation of $225,000. Both boards intended to accomplish two purposes through this consultation agreement. First, the merged corporation wanted Johns to be available for consultation and to serve as a director when needed. Second, the agreement assured that Johns would not establish any employment relationship with another bank or savings institution without the approval of the merged company. Around April 25, 1984, Southwest and Johns officially entered into the consulting agreement.

In December 1983, Southwest and Landmark mailed a joint proxy statement to their shareholders. The joint proxy statement described the terms of the merger, as well as PIP and the consulting agreement. On January 19, 1984, the shareholders of both Southwest and Landmark voted to approve the merger. Subsequently, the requisite regulatory approval was obtained.

---

4. Southwest did establish a bonus system prior to PIP. In 1982, Southwest's board authorized a new Management Incentive Compensation Plan for two key employees, Johns and Sherman. Although 50,000 units were awarded to each recipient, the payments were never made, and the Management Incentive Compensation Plan was canceled in 1983 when PIP was adopted.

5. No provision in Southwest's articles of incorporation or bylaws limited the power of the board to fix the compensation of the officers and directors.

6. The PIP Committee itself was disinterested, for only one PIP recipient was a member.

7. The other recipients were Mario Marchese, 25,000 units; John W. Gibbs, 25,000 units; and Wayne Stanhouse, 20,000 units.

Southwest and Landmark, therefore, merged, and the separate existence of Southwest ended.

On January 10, 1984, Southwest made the monetary awards that the PIP Committee specified.[8] This disbursement of PIP funds gave rise to a lawsuit. A disgruntled Southwest shareholder filed a derivative action in United States District Court contending that PIP and the consulting agreement were a waste of corporate assets. The shareholder sued all of Southwest's directors and the other PIP recipients. On July 12, 1984, Southwest's board convened a special meeting to address the merits of this lawsuit. At the meeting, the board again ratified PIP and the PIP awards, noting that PIP had achieved its purpose of keeping the management group together until the time of the merger.

In February 1985, the parties to the derivative action settled the litigation and the court approved the settlement on April 30, 1985. The settlement provided for the shareholder to dismiss the action in exchange for the return to Landmark of $600,000 awarded under PIP, as well as a reduction in the term of John's consulting agreement from five years to two and one-half years. The directors did not admit liability in the settlement agreement.

The officers and directors, who were sued as defendants in the derivative action, filed a claim against their liability insurance policy seeking to recover this repayment. The policy, issued in December 1982 by International Insurance Company ("International"), covered the directors and officers for all losses (including damages and settlements) resulting from their "wrongful acts" (actual or alleged) committed within the scope of their employment. The policy also contained two key exclusion clauses.[9] The first provision, paragraph 5(c), excluded any loss resulting from any illegal remuneration that the director or officers received without required shareholder approval. The second condition, paragraph 5(b), excluded any loss resulting from any illegal personal gain by the officer or director.

---

**8.** The PIP recipients and amounts were:

| | |
|---|---|
| Alfred M. Johns | $1,000,000 |
| Richard W. Sherman | 1,000,000 |
| James W. McFadden | 500,000 |
| Thomas V. Ogletree | 400,000 |
| G. Paul Whorton | 400,000 |
| Mario Marchese | 250,000 |
| John W. Gibbs | 250,000 |
| Wayne Stanhouse | 200,000 |

**9.** The relevant clauses in the insurance policy read as follows:

1. The Insuring Clause:
 "If during the policy period any claim or claims are made against the Insureds ... or any of them for a Wrongful Act (as hereinafter defined) while acting in their individual or collective capacity as Directors or Officers, the Insurer will pay on behalf of the Insureds or any of them [100%] of all Loss (as hereinafter defined), which the Insureds or any of them shall become legally obligated to pay ..."
2. "Wrongful Act":
 "The term 'Wrongful Act' shall mean any actual or alleged error or misstatement or misleading statement or act or neglect or breach of duty by the Insureds while acting in their individual or collective capacities, or any matter not excluded by the terms and conditions of this policy claimed against them solely by reason of their being Directors or Officers of the Company."
3. "Loss":
 "The term 'Loss' shall mean any amount which the Insureds are legally obligated to pay for a claim or claims made against them for Wrongful Acts, and shall include but not be limited to damages, judgments, settlements and costs, costs of investigation ... and defense of legal actions, claims or proceedings and appeals therefrom, cost of attachment or similar bonds; providing always, however, such subject of loss shall not include fines or penalties imposed by law, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed."
4. Illegal Profit (Paragraph 5(b)):
 "The insurer shall not be liable to make any payment for loss in connection with any claim made against the Insured's: ... (b) based upon or attributable to their gaining in fact any personal profit or advantage to which they were not legally entitled."
5. Illegal Remuneration (Paragraph 5(c)):
 "The Insurer shall not be liable to make any payment for loss in connection with any claim made against the Insureds: ... (c) for the return by the Insureds of any remuneration paid to the Insureds without the previous approval of the stockholders of the Company which payment without such previous approval shall be held by the courts to have been illegal."

International received timely notice of the claims asserted in the derivative action. When the terms and conditions of the compromise were disclosed to International, it expressed no objection to the settlement, reserving only a right to contest coverage.[10]

International paid the *pro rata* share of the cost of defending the derivative action of those defendants not named in the case at bar,[11] denied coverage for the settlement payments, and brought this declaratory action to interpret the policy. The appellees counterclaimed for payment pursuant to the policy terms.

## DISCUSSION

We agree with the district court that this case involves two contractual interpretation inquiries.[12] First, we must ascertain whether the settlement in the derivative action falls within the policy's definition of "loss." Second, if a loss exists, we need to determine whether the policy's exclusions bar coverage. We will determine the appropriate standard of review before examining each of these interpretation questions in turn.

## I. PLENARY REVIEW GOVERNS THIS APPEAL.

Because both interpretation inquiries are mixed questions of fact and law,[13] the district court's findings here are subject to plenary review. *See Atlantic Land and Improvement Co. v. United States*, 790 F.2d 853, 855 (11th Cir.1986) (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)). Within this context, the district court's findings of fact are deferentially treated, and may be reversed only if clearly erroneous. *See*

*Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Moreover, certain mixed questions of law and fact that involve assessments peculiarly within the province of the trier of fact are also reviewable under the clearly erroneous rule. *See Lucas v. Florida Power & Light Co.*, 765 F.2d 1039, 1041 (11th Cir.1985) (finding mixed questions of law and fact, such as materiality, scienter and reliance, to be governed by the clearly erroneous rule).

## II. A LOSS DID RESULT FROM THE SETTLEMENT OF THE DERIVATIVE ACTION.

Before determining whether the settlement constituted a loss, an examination of the terms of the compromise is necessary. The parties, in reaching this accord, actually entered into two settlements. First, the parties resolved the allegations against PIP by having the directors pay $600,000 to Southwest. Second, the parties resolved the claims with respect to the consulting agreement by reducing its term to two and one-half years. Accordingly, a determination of whether each of these settlements is a loss becomes necessary.

The district court found both settlements to constitute losses. The district court believed the repayment of a portion of PIP fit squarely within the policy's definition of loss. The court considered this recompense to be, in the policy's own language defining loss, a "settlement for alleged wrongful acts." Similarly, the court found the reduction in the term of Johns' consulting contract to be a loss. The court below characterized the corresponding decrease in the contract's value as a sum certain

---

**10.** The defendants in the derivative action who are not parties in this case assigned to appellees Johns, McFadden and Sherman all rights they may have had against International arising from the settlement of the derivative action. In exchange, these appellees paid the costs of both the settlement and defense of the derivative litigation attributable to these defendants.

**11.** The total costs of the defense were $82,794.31 and International paid $40,615.08 of that

amount under the policy these derivative action defendants.

**12.** Jurisdiction in the district court was premised upon diversity of citizenship pursuant to 28 U.S.C. § 1332 (1982). Our jurisdiction is premised upon 28 U.S.C. § 1291 (1982).

**13.** To resolve these questions, we must utilize factual findings and interpretation principles. Accordingly, the issues are mixed questions of fact and law.

"payment" for alleged wrongful conduct, which the policy specifically covered.

The appellant challenges the district court's findings on two fronts. International first contends that the PIP repayment cannot logically be a loss. The insurance company focuses upon PIP as a superfluous bonus system where directors received large payments because of their positions without reference to their performance. International believes that by settling the derivative action, the directors did not forgo a bonus, but just received a lesser amount. From this perspective, because the directors did not forgo a bonus altogether, they cannot be considered as having "lost" anything. As a second attack, International maintains that the reduction in the term of Johns' consulting agreement failed to result in an out-of-pocket loss. For International, the reduction in the length of the agreement was essentially the forgoing of future payments to which Johns was not entitled. To International, this deprivation cannot be a compensable loss.

Our starting point for examining the insurance policy must be the contract's language. Where the language of an insurance contract is clear and unambiguous, "there is no occasion for construction." *Rigel v. National Cas. Co.*, 76 So.2d 285 (Fla.1954); *Federal Ins. Co. v. McNichols*, 77 So.2d 454 (Fla.1955). The policy's language is to be taken and understood in its plain, ordinary and popular sense. *New Amsterdam Cas. Co. v. Addison*, 169 So.2d 877 (Fla. 2d DCA 1964); *Peninsular Life Ins. Co. v. Rosin*, 104 So.2d 792 (Fla. 2d DCA 1958). The court cannot make a new contract for the parties where they themselves have employed express and unambiguous words. *Liberty Mut. Ins. Co. v. Imperial Cas. & Indem. Co.*, 168 So.2d 688 (Fla. 3d DCA 1964).

■ The portion of the settlement dealing with PIP fits within the plain language of the policy's definition of loss. The policy defines "loss" as any amount that the insureds are legally obligated to pay for claims of "wrongful acts," including settlements. The insurance contract defines "wrongful acts" as any alleged or actual breaches of duties. In settling the derivative action, the directors became legally obligated to pay a sum to reconcile allegations of breaches of fiduciary duties. Under the ordinary and popular meaning of the language defining loss, therefore, the $600,000 that settled the claims relating to PIP is a loss.

■ The reduction in the time frame of the consulting agreement presents a different situation. Obviously, the settlement did not require the directors to make a specified monetary payment. Under the policy's language defining loss, the reduction in the contract's term cannot be considered an "amount that the insureds were legally obligated to pay." Nevertheless, a "loss," at least under that word's ordinary meaning, appears to have resulted, for director Johns relinquished a portion of a contract that he previously had a right to enforce. Accordingly, we agree with the district court that the issue of whether the parties intended the term "amounts paid" to cover just out-of-pocket loss or also other types of financial loss is unclear.[14] *See generally Specialty Restaurants Corp. v. City of Miami*, 501 So.2d 101, 103 (Fla. 3d DCA 1987) (finding a contract to be ambiguous when its language is reasonably susceptible to more than one interpretation, or is subject to conflicting inferences).

In Florida, courts should construe ambiguous or equivocal terms strictly against the insurer, and liberally in favor of the insured. *Fireman's Fund Ins. Co. v. Boyd*, 45 So.2d 499 (Fla.1950); *Hodges v. National Union Indem. Co.*, 249 So.2d 679 (Fla. 1971). To enforce the insurance policy's dominant purpose of protecting against ca-

---

**14.** In Florida, a contract of insurance should be read to give effect to the intention of the contracting parties. *Liberty Mut. Ins. Co. v. Imperial Cas. & Indem. Co.*, 168 So.2d 688 (Fla. 3d DCA 1964). Courts should construe contracts of insurance to achieve a construction that is prac-

tical and reasonable as well as just. *Martin v. Nationwide Mut. Fire Ins. Co.*, 235 So.2d 14 (Fla. 2d DCA 1970). The finding that the language here is ambiguous is consistent with the intent of the parties.

tastrophes, courts must strictly adhere to this rule where a provision of a policy relating to coverage is concerned. *National Merchandise v. United Serv. Auto Assoc.*, 400 So.2d 526 (Fla. 1st DCA 1981). Accordingly, the meaning of an ambiguous term in an insurance contract must be construed against the drafter and in favor of coverage. *See, e.g., Gulf Tampa Dry Dock Co. v. The Great Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir.1985); *see also, Stuyvesant Ins. Co. v. Butler*, 314 So.2d 567, 570 (Fla.1975).

Pursuant to these authorities the district court properly concluded that the settlement with respect to the consulting agreement was a loss. Because of the ambiguity, we must construe the term "loss" against International, and in favor of coverage. The foregoing of receiving $565,-500 that resulted from the reduction in the contract's length constituted a payment for alleged wrongful acts, and, thus, a loss within the context of this policy.[15]

All aspects of the settlement of the derivative action, therefore, constitute "losses.[16]" Pursuant to the insurance contract, International must pay the appellees for these losses, unless the policy's exclusion provisions are applicable. We now turn to the issue of whether the two relevant exclusion clauses pertain to the appellees' losses.

III. NEITHER OF THE TWO RELEVANT EXCLUSION CLAUSES BARS RECOVERY FOR THE LOSSES.

International argues that two exclusion clauses except the appellees' losses from coverage. The first exclusion provision, paragraph 5(c), provides that International is not liable for any loss resulting from the insured's repayment of remuneration received without necessary prior shareholder approval. The second exclusion, paragraph 5(b), provides that International is not responsible for any loss "attributable to the insureds gaining in fact any personal profit or advantage to which they were not legally entitled."

The district court found both provisions inapplicable. For the district court, paragraph 5(c) could not pertain because the disinterested Southwest board's adoption of both PIP and the consulting agreement negated the need for shareholder approval. The court below also found the second exclusion inapplicable for two reasons. First, under traditional insurance law principles requiring a court to read specific provisions before general, the district court believed paragraph 5(b) was superfluous. To the district court, both PIP and the consulting agreement concerned remuneration. As such, they fell within the specific illegal remuneration exclusion of paragraph 5(c), not the general illegal profit exception of paragraph 5(b). Second, the district court also believed PIP and the consulting agreement did not provide illegal profits because sufficient consideration supported both plans.

We affirm the district court in all respects. The appellant has failed to show that certain factual findings that defeat the application of paragraph 5(c) are clearly erroneous. Moreover, paragraph 5(b) is inapplicable because the appellant cannot establish that either PIP or the consulting agreement gave the directors illicit profits.

**15.** This conclusion is necessarily logical. After considering that the contract provided for annual compensation of $225,000, Johns lost $565,-500 through a two and one-half year reduction. By reducing the term of the contract, Johns could no longer receive $565,500 to which he had a vested, not speculative, expectation. This $565,500 must be considered an "amount paid for alleged wrongful acts," and, thus, falls within the policy's definition of loss.

**16.** We similarly reject International's argument that the policy when read as a whole cannot

support the finding of a loss. International maintains that the term loss should be read with the exclusions. International contends that because the settlements fall within the exclusions, these payments cannot be losses. This position, however, is counter-intuitive. The plain language of the exclusions exempts "losses." Before a court reads the exclusions, therefore, a loss must exist. From this perspective, we cannot read the definition of loss simultaneously with the exclusions.

**A. Because A Disinterested Board Ratified Both PIP And The Consulting Agreement, Paragraph 5(c) Is Inapplicable.**

■ Two of the district court's factual findings negate the exclusion of paragraph 5(c). This paragraph excludes from coverage losses resulting from remuneration received without shareholder approval, if such approval is required. Because a disinterested Southwest board ratified both plans, shareholder approval was not necessary to effectuate PIP and the Johns' agreement. Fla.Stat.Ann. § 607.124(1)(a) (West 1977). Moreover, even if shareholder approval was necessary, a majority of Southwest's shareholders ratified the plans when they approved the merger with Landmark.

■ Essentially, International only challenges the district court's finding of a disinterested board. International contends that Southwest's board was not disinterested because as many as eight to ten directors were officers of Southwest subsidiaries, and, thus, potential recipients of PIP awards. As support, appellant maintains that the district court improperly failed to take judicial notice of Polk's World Bank Dictionary, wherein these board members are listed as officers. This authoritative guide, however, cannot defeat the finding of disinterestedness, which the district court made after hearing testimony and receiving evidence. After considering the entire record, we do not have a "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). These factual findings must stand, and the exclusion in paragraph 5(c) cannot exempt the appellees' losses.

**B. Even If The Court Would Consider Paragraph 5(b), This Exclusion Would Not Bar Appellees' Losses From Coverage.**

We find that the exclusion of paragraph 5(b) does not bar the appellees' losses from coverage for two reasons. First, the principles governing construction of insurance policies bar this court from applying this exclusion. Second, even if the court considered this provision, the specific requirements necessary for this exclusion to apply cannot be met because neither PIP nor the consulting agreement are illegal under Florida corporate law. We now expound upon these conclusions in turn.

1. *Principles of contract interpretation bar this court form considering paragraph 5(b).*

In Florida, a court must construe every insurance contract according to the entirety of its terms and conditions. Fla.Stat.Ann. § 627.419(1) (West 1986). A court should construe each sentence in connection with other provisions of the policy to arrive at a reasonable construction that accomplishes the intended purpose of the parties. *Haenal v. United States Fidelity & Guar. Co.*, 88 So.2d 888 (Fla.1956). Because courts assume that the parties intended each provision to be relevant, courts must avoid a construction that does not give all portions of the policy meaning and effect. *First Nat'l. Bank of Midland v. Protective Life Ins. Co.*, 511 F.2d 731, 734 (5th Cir.1975); *Martindale Lumber Co. v. Bituminous Cas. Corp.*, 625 F.2d 618, 623 (5th Cir.1980) (citing authority).

If paragraph 5(b) applied here, the exclusion of paragraph 5(c) would be rendered superfluous. An exclusion that exempts all illegal personal profit from coverage necessarily excludes all remuneration received without required shareholder approval. A director receiving compensation without required shareholder approval would be receiving an illegal personal profit. The exclusions in both paragraphs 5(b) and 5(c), therefore, exclude remuneration illegally received without required shareholder approval. This "double" exclusion renders paragraph 5(c) meaningless, for a court would treat all remuneration received without required shareholder approval as illegal personal profit. A court, therefore, would exclude the loss under paragraph 5(b), and never consider paragraph 5(c).

In an effort to give effect to both provisions, we conclude that the exclusion of paragraph 5(b) is inapplicable here. Para-

graph 5(c) alone concerns remuneration that is illegal because of a lack of shareholder approval. In these situations, a court should not consider the terms of paragraph 5(b). This construction effectuates each provision, and, consequently, is fully consistent with the intentions of the contracting parties. *See Liberty Mutual Ins. Co. v. Imperial Cas. and Indem. Co.,* 168 So.2d 688 (Fla. 3d DCA 1970).

## 2. *The facts of this case cannot satisfy the requirements of paragraph 5(b).*

Although we need not consider paragraph 5(b) under interpretation principles, we, like the district court, will determine the applicability of paragraph 5(b). The facts of this case do not satisfy the plain requirements that must be met before this exclusion can apply. Accordingly, an examination of paragraph 5(b) provides a separate ground for affirmance.

As the language of paragraph 5(b) indicates, the parties intended this exclusion to exempt from coverage any loss resulting from the directors receiving any illegal personal profit. The issue now presented, therefore, is whether these two executive compensation plans, each properly labeled a golden parachute,[17] gave their recipients an illegal profit because the plans themselves were wasteful.

Three major analytical viewpoints have developed to determine the legality of golden parachutes. The first approach examines the compensation system under traditional corporate law to see if the payments constitute corporate waste. *See, e.g., Orin v. Huntington Bancshares,* 18 Sec.Reg. &

L.Rep. (BNA) 1719 (Ohio Ct.C.P. September 30, 1986); *see also* Note, *Golden Parachutes And The Business Judgment Rule: Toward A Proper Standard Of Review,* 94 Yale L.J. 909 (1985). The second school of thought, best labeled the Wisconsin view, characterizes golden parachutes as stipulated damages clauses for a breach of an employment contract. *See Koenings v. Joseph Schlitz Brewing Co.,* 126 Wis.2d 349, 377 N.W.2d 593 (Wis.1987), *see also* Note, *Koenings v. Joseph Schlitz Brewing Co.: The Wisconsin Supreme Court Addresses Executive Benefits In a Golden Parachute Contract,* 1987 Wis.L.Rev. 823 (1987). As with all such clauses, the amount of stipulated damages must be reasonably related to the actual damages caused by a breach; otherwise, the clause becomes a penalty for a breach, and, thus, is void as against public policy. Note, *Platinum Parachutes: Who's Protecting The Shareholder,* 14 Hofstra L.Rev. 653, 661 n. 66 (1987). The third reviewing technique treats golden parachutes as insurance, designed to cover the losses an executive sustains from the disassociation with the corporation. *See* Note, *Golden Parachutes: Untangling the Ripchords,* 39 Stan.L.Rev. 955 (1987). This review determines whether the golden parachute "overinsures" the executive, in which case the plan is void as violating public policy. *Id.*

We need not interpret the policy to determine if paragraph 5(b) requires us to analyze these plans under all three viewpoints. The appellant only argues that PIP and the consulting agreement are illegal because they are corporate waste.[18] Our

---

**17.** Both PIP and the Johns consulting agreement must be characterized as golden parachutes. While also designed as a bonus system, PIP did provide substantial bonuses when control in Southwest changed. Similarly, the payments Johns was to receive pursuant to the consulting contract could only occur upon the change of control in Southwest. Because both compensation plans linked payments to a change of control in Southwest, they are golden parachutes. *See Revlon, Inc. v. MacAndrews and Forbes Holdings, Inc.,* 506 A.2d 173, 178 n. 5 (Del.1986). This nomenclature has a mere nominal effect, for the fact that these compensation plans are labeled "golden parachutes" has

no legal significance. *Koenings,* 377 N.W.2d at 599.

**18.** Paragraph 5(b) conceivably could allow an analysis of golden parachutes under the other two views. Paragraph 5(b) exempts from coverage any "illegal" profit. If either PIP or the consulting agreement failed under these two approaches, the plan would be void as against public policy. Logically, the recipients, therefore, would have illegally profited.

The significance of the appellant not raising these arguments, however, is minor. Because we ultimately find that both plans were reasonably related to the services provided, the requirements of either approach would be satis-

review, therefore, is limited to determining whether both plans are legal under Florida corporate law.[19]

■ To determine the legality of a board's decision to implement executive compensation plans a reviewing court must first realize the interplay between two important Florida policies. Florida specifically empowers the directors to fix their own compensation. Fla.Stat.Ann. § 610.111 (West 1977). For matters that Florida law vests in the board, the board has wide discretion, and a court generally will not substitute its judgment for that of the directors. *Orlando Orange Groves Co. v. Hale*, 119 Fla. 159, 161 So. 284 (Fla.1935); *Lake Region Packing Assoc. Inc. v. Furze*, 327 So.2d 212 (Fla.1976); *Citizens Nat'l. Bank v. Peters*, 175 So.2d 54 (Fla. 2d DCA 1965); *Yarnell Warehouse & Transfer, Inc. v. Three Ivory Bros. Moving Co.*, 226

So.2d 887 (Fla. 2d DCA 1969). This deference given the board is known as the business judgment rule.[20] Accordingly, in Florida the business judgment rule apparently governs the review of a board's decision to enact like golden parachutes.[21]

■ In the golden parachute context, however, two obstacles to the application of the business judgment rule necessarily arise. Golden parachutes may be considered a defense to a corporate takeover. *See* Note, *Golden Parachutes*, 94 Yale L.J. 909, 918 n. 45 (1985). Courts usually review a board's adoption of a takeover defense in a different manner than an ordinary application of the business judgment rule. *See Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985). Additionally, because a board usually awards golden parachutes to its members, issues of self-dealing arise. Self-interested transac-

fied. Our analysis finds that the plans included all reasonable economic and noneconomic costs of displacement, so the Wisconsin view would be satisfied. *Koenings v. Joseph Schlitz Brewing Co.*, 377 N.W.2d at 602–603. Similarly, the plans never can be considered overinsurance because the coverage reasonably reflected the anticipated losses.

**19.** Florida corporate law controls this issue for two reasons. First, because the parties failed to consider the choice of law in this diversity case, we must presume that the substantive law of the forum (Florida) controls. *Baltimore Orioles, Inc. v. Major League Players, Assn.*, 805 F.2d 663, 681 n. 33 (7th Cir.1986), *cert. denied*, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Second, we believe the dictates of *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) require an application of Florida corporate law. Under *Klaxon Co.*, we must apply the choice of law rules of Florida to this diversity case. *Id.* Although the Florida Supreme Court has not addressed the choice of law in this corporate context, we believe that a Florida court would apply the choice of law rules of the *Restatement (Second) of Conflicts of Laws* (1971). Florida courts have utilized this treatise in other choice of law areas. *E.g., Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla.1980) (applying §§ 145–146 of *Restatement (Second) of Conflicts of Law* ); *Continental Mortgage Investors v. Sailboat Key, Inc.*, 395 So.2d 507 (1981) (applying § 203 of *Restatement (Second) of Conflicts of Law* ). We, therefore, feel comfortable in applying *Restatement (Second) of Conflicts of Laws* § 309, which provides that the law of the state of incorporation governs the liabilities of the officers or directors to the corporation. *Cf. Robert A. Wa-*

*chsler, Inc. v. Florafax Intern, Inc.*, 778 F.2d 547, 549–550 (10th Cir.1985) (applying *Restatement (Second) of Conflicts of Law* to merits because forum state applied other sections of Treatise). Because Southwest incorporated in Florida, Florida law controls.

**20.** The business judgment rule is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges. *Mills v. Esmark, Inc.*, 544 F.Supp. 1275, 1282 n. 3 (N.D.Ill.1982). Courts have formulated this rule to safeguard the corporate law policy that assures stockholders the right to vote directors out of office if they disagree with their decisions. *Entesra Corp. v. SGS Associates*, 600 F.Supp. 678, 685 (E.D.Pa.1985). The rule's essential premise is that "absent any wrongdoing, the board's business decisions should not be fodder for in-depth *ex post* legal scrutiny." *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971); *Shlensky v. Wrigley*, 95 Ill.App.2d 173, 183, 237 N.E.2d 776, 781 (Ill.App.Ct.1968).

**21.** In this regard, Florida is in accord with several other states. *See, e.g., Spang v. Wertz Egrg. Co.*, 382 Pa. 48, 114 A.2d 143, 144 (Pa.1955); *Heller v. Boylan*, 29 N.Y.S.2d 653 (N.Y.S.Ct. 1941), *aff'd*, 263 A.D. 815, 32 N.Y.S.2d 131 (1941). The oft-cited *Heller* case epitomized the reasons for this standard of review. The *Heller* court believed that because "merit is not always commensurately rewarded, while mediocrity sometimes unjustly brings incredibly lavish returns, courts are ill-equipped to solve or even grapple with" compensation problems. *Heller*, 29 N.Y.S.2d at 679–80.

tions of the board are seldom afforded the protections of the business judgment rule. *See Cohen v. Ayers,* 596 F.2d 733, 739 (7th Cir.1979). We now determine whether any of these obstacles precludes our review of PIP and the consulting agreement under the business judgment rule.

In the takeover context, courts are wary of board action designed to ward off potential acquirers. *Unocal Corp.,* 493 A.2d at 954–955.[22] When considering to enact a takeover defense,[23] the directors are confronted with the natural desire to remain entrenched. *Id.* (citing *Bennett v. Propp,* 41 Del.Ch. 14, 187 A.2d 405, 409 (1962)). The board has this entrenchment desire irrespective of whether the company faces an actual buyout offer, *see Unocal Corp.,* 493 A.2d 946 (Del.1985), or one in the distant future, *see Moran v. Household Int'l, Inc.,* 500 A.2d 1346 (Del.1985).

Because of the desire for entrenchment in this context, courts review the board's enactment of takeover defenses with closer scrutiny. Courts have developed two prerequisites that must be satisfied before the protections of the business judgment apply. *See Unocal Corp.,* 493 A.2d at 955. Before the board's action can fall within the business judgment rule, the directors must prove "(1) they had reasonable grounds to believe that a danger to corporate policy existed, which can be satisfied by a showing of good faith and reasonable investigation, and, (2) that the defensive measure adopted is reasonable in relation to the threat posed." *Unocal Corp.,* 493 A.2d at 955, *as cited in Tate & Lyle PLC v. Staley Continental, Inc.,* [1987–1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) § 93,764 at p. 98,585, 1988 WL 46064

(Del.Ch.Ct. May 9, 1988). If these requirements are met, the business judgment rule applies, and the challenging party must prove a breach of fiduciary duties to prevail. *Moran,* 500 A.2d at 1356 (citing *Unocal Corp.,* 493 A.2d at 598).

Whether the *Unocal* prerequisites apply in the golden parachute context is a difficult question. Commentators cannot agree on whether golden parachutes are truly takeover defenses. Because of the high cost of corporate takeovers and the relatively modest cost of most golden parachutes, some commentators believe golden parachutes have "no deterrent effect on takeovers." *See* Morrison, *Those Executive Bailout Deals,* Fortune, Dec. 13, 1982, 86 (quoting Martin Lipton, a takeover specialist at the law firm of Wachtell, Lipton, Rosen and Katz); *accord* Note, *Untangling The Ripcords,* 39 Stan.L.Rev. 955, 958 n. 15 (1987); *see also* Note, *Golden Parachutes,* 94 Yale L.J. at 918 n. 45 (arguing that golden parachutes "may encourage takeovers by reducing senior executives' opposition to them"). On the other hand, some commentators believe that golden parachutes can be large enough or spread out among sufficient executives to serve as a takeover defense. *See* Note, *Untangling The Ripcords,* 39 Stan.L.Rev. at 974 n. 91 (1987); *see also* Cooper, *The Spread of Golden Parachutes,* Institutional Investor, Aug.1982 at 65, 68.

We believe the intent of the corporation's board should be determinative of whether the enactment of a golden parachute is subject to the *Unocal* standard. If the board intended the parachutes to be a defense to a takeover, then the directors must meet the *Unocal* prerequisites. *See*

---

**22.** We rely with confidence upon Delaware law to construe Florida corporate law. The Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines. *See, e.g., Davidson v. Ecological Science Corporation,* 266 So.2d 71 (Fla. 3d DCA 1972) (relying on Delaware case law to interpret Fla.Stat.Ann. § 608.39(3) (now repealed)); *De La Rosa v. Tropical Sandwiches, Inc.,* 298 So.2d 471 (Fla. 3d DCA 1974) (relying on Delaware case law to interpret Fla.Stat.Ann. § 608.19(1) (now repealed)); *Naples Awning & Glass, Inc. v. Cirou,* 358 So.2d 211 (Fla.2d DCA 1978) (relying on Delaware case law to interpret Fla.Stat. Ann.

§ 608.13(9)(b) (now repealed)); *see also Greco v. Tampa Wholesale Co.,* 417 So.2d 994, 996–997 (Fla. 2d DCA 1982) (relying upon New York case law to interpret Fla.Stat.Ann. § 607.247(10) (West 1977)).

**23.** As this court noted in *Cottle v. Storer Communications, Inc.,* 849 F.2d 570, 572 (11th Cir. 1988), takeover defenses include "white knights, poison pills, shark repellents, stalking horses, crown jewels, hello fees, goodbye fees and asset lock-up options."

*Buckhorn, Inc. v. Ropak Corp.,* 656 F.Supp. 209, 232–35 (S.D.Ohio 1987) (approving and disapproving of several golden parachutes under the *Unocal* standard). If the board enacts the parachutes when a specific takeover offer has been made, a reviewing court may infer such an intent. *See generally Bender v. Highway Truck Drivers & Helpers Local 107,* 598 F.Supp. 178, 189 n. 16 (E.D.Pa.1984) (noting that a golden parachute enacted during a hostile takeover battle may be unenforceable); Note, *Untangling The Ripcords,* 39 Stan. L.Rev. at 974 n. 90. If the board possessed a different intent, then the directors do not have to satisfy the *Unocal* requirements in order for the business judgment rule to apply. *Cf. Tate & Lyle PLC v. Staley Continental, Inc.,* [1987–1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) § 93,764 at p. 98,583, 1988 WL 46064 (Del.Ch.Ct. May 9, 1988) (apparently refusing to examine golden parachutes under *Unocal* standard in favor of traditional business judgment review).

■ The district court below did not find that Southwest's board intended to enact PIP and the consulting agreement as takeover defenses. The district court found PIP's purpose to be the retention of a talented management group, while the function of the consulting agreement was to prevent a member of that group from competing with the company. The record supports these findings. The appellees, therefore, do not have to meet the *Unocal* standards for the business judgment rule to apply.

■ The Southwest directors, however, do have to overcome the second obstacle to a business judgment rule application. Generally, courts will not review under the business judgment rule a board's enactment of a compensation plan in which the

directors have a personal interest.[24] *Cohen v. Ayers,* 596 F.2d 733, 739 (7th Cir. 1979); *Treadway Cos. v. Case Corp.,* 638 F.2d 357, 382 (2d Cir.1980). These self-interested compensation plans are voidable. *See Kerbs v. California Eastern Airways,* 33 Del.Ch. 69, 90 A.2d 652, 655 (Del.1952). In this type of "self dealing" situation, the courts require the board to prove good faith and adequate consideration. *Id; cf. Treadway Cos.,* 638 F.2d at 382 (finding that for self dealing transaction the test must be whether the payments were "fair and reasonable" to the corporation); *Weinberger v. U.O.P., Inc.,* 457 A.2d 701 (Del. 1983) (finding that directors must show "entire fairness" of self-interested transaction). If under such scrutiny the corporate payments fail, the payments constitute corporate waste. *See Kerbs v. California Eastern Airways,* 33 Del.Ch. 69, 90 A.2d 652, 656 (Del.1952); *Findaque v. American Maracaibo Co.,* 33 Del. Ch. 262, 92 A.2d 311, 320–21 (Del.Ch.Ct.1952).[25]

■ A review of a self-interested transaction under the business judgment rule, however, is not foreclosed in two circumstances. First, Fla.Stat.Ann. § 607.124(1)(a)-(b) (West 1977) provides that a director's self-interested transaction is not void or voidable if after full disclosure a disinterested board or a majority (or an amount specified in the bylaws) of the corporation's stockholders approves the plan. *See also Cohen,* 596 F.2d at 739. If this ratification occurs, the court will review the implementation of the action under the business judgment rule. *Cohen,* 596 F.2d at 739. Second, when a board's enactment of a course of action merely effectuates the plans of a disinterested directors' committee, the board's action is *prima facie* subject to the protections of the business judgment rule. *In re Damon Corp. Stockhold-*

24. Pursuant to this rule, we naturally would be hesitant to invoke the business judgment rule to review golden parachutes adopted during the course of a leveraged buyout. Because the management has specific knowledge of a leveraged buyout, including all the consequences of continued employment, a golden parachute enacted during this time may be an ultimate act of self-dealing. The takeover of Southwest was not a leveraged buyout, so these concerns do not present themselves here.

25. If the payment plan constitutes corporate waste, then neither the Board nor the majority of the corporations shareholders can ratify the plan. *See Kerbs,* 90 A.2d at 656. Only a unanimous shareholder approval can ratify corporate waste. *Id.*

*ers Litig.*, [1988–1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) § 94,040 at p. 90,872, 1988 WL 96192 (Del.Ch.Ct. September 16, 1988); *cf.* Fla.Stat.Ann. § 607.111(5)(c) (West 1977) (authorizing director to rely upon director subcommittee's decisions).

We must review PIP and the consulting agreement under the business judgment rule because both circumstances are found here.[26] A disinterested Southwest board and a majority of Southwest's shareholders approved PIP and the consulting agreement. In addition, the Southwest board's adoption of PIP essentially effectuated the desires of the PIP Committee.

 Under the business judgment rule, courts presume that directors have acted properly and in good faith.[27] *See Cottle v. Storer Communication Inc.*, 849 F.2d 570, 574 (11th Cir.1988). A court will not call upon a director to account for his action in the absence of a showing of abuse of discretion, fraud, bad faith, or illegality. *See, e.g., Lake Region Packing Assoc. Inc. v. Furze*, 327 So.2d 212, 214 (Fla.1976). Essentially, unless the party challenging the board's action can prove one of these four factors, the court will not substitute its judgment for that of the board so long as the action taken was rational. *See Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985).

 Because of this great deference, courts do not invalidate executive compensation systems under the business judgment rule unless they constitute corporate waste. *Rogers v. Hill*, 289 U.S. 582, 591–92, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933). Corporate waste exists when the payment is afforded without "adequate" consideration.[28] *Michelson v. Duncan*, 407 A.2d 211, 217 (Del.1979). Under the business judgment rule, adequacy of considera-

tion is left to the sound discretion of the directors, and courts do not invalidate compensation plans so long as the compensation the executive receives bares a reasonable relationship to the services rendered. *Rogers*, 289 U.S. at 591–92, 53 S.Ct. at 735; *Cohen v. Ayers*, 596 F.2d 733, 739 (7th Cir.1979); *Kerbs v. California Eastern Airways, Inc.*, 90 A.2d 652, 656 (Del.1952). A compensation plan passes this "reasonable relationship" test if the payment insures that the benefit provided by the services rendered will inure to the corporation. *Kerbs*, 90 A.2d at 657; *accord, Kaufman v. Shoenberg*, 33 Del.Ch. 211, 91 A.2d 786 (Del.1952); *Forman v. Chesler*, 39 Del. 484, 167 A.2d 442 (Del.1962).

 Necessarily, the reasonable relationship analysis requires a court to conduct three inquires. First, the court must determine whether the corporation benefited from the services rendered. If the corporation received no benefits in exchange, the payments insured nothing, and the compensation system is corporate waste. Second, a court should examine whether the compensation was so unreasonably disproportionate to the benefits created by the exchange that a reasonable person would think the corporation did not receive a *quid pro quo*. *Fidanque v. American Maracaibo Co.*, 92 A.2d 311, 321 (Del.Ch.Ct.1952). If no *quid pro quo* resulted, no true benefit could inure to the corporation, for the payments would constitute corporate gifts, and, therefore, would offset any benefit received in exchange. *Id.* Finally, a court must conclude that the services rendered triggered the payments. *See Rogers v. Hill*, 289 U.S. 582, 591–92, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933); *see also Gruber v. Chesapeake & O. R. Co.*, 158 F.Supp. 593 (N.D.Ohio 1957); *Holthusen v. Edward G. Budd Mfg. Co.*, 52 F.Supp. 125 (E.D.Pa.

---

**26.** All parties agrees that both plans should be reviewed under the business judgment rule.

**27.** In Florida, directors must perform their duties "in good faith, [and] in a manner they reasonably believe to be in the best interest of the corporation, and with such care as an ordinary prudent person in a like position would use under similar circumstances." Fla.Stat. Ann. § 607.111(4). Directors are not liable for

actions taken in accord with this statute. Fla. Stat.Ann. § 607.111(6).

**28.** Of course, if the plan is a corporate gift, the payments must also fail under the business judgement rule. A corporate gift is a payment that is completely unsupported by consideration. *Michelson v. Duncan*, 407 A.2d 211, 217 (Del.1979).

1952). If some other event triggers payment, the payment cannot reasonably assure anything. *Compare Gruber*, 158 F.Supp. 593 (approving of plan because business success was precondition to payment) *with Holthusen*, 52 F.Supp. 125 (invalidating compensation plan because stock market happenings triggered payment).[29]

■ In conducting these three inquiries for both PIP and the consulting agreement,[30] we note that the parties agreed that International had the burden of proof on this issue in the court below.[31] To prevail, therefore, International must prove that PIP and the consulting agreement were corporate waste. In this respect, International's burden of proof differs from that of the appellees on the issue of whether a loss occurred. The appellees, pursuant to the policy's definition, did not have to prove actual wrongdoing, but only alleged misbehavior.

### a. PIP is not corporate waste.

■ In important respects, PIP is not a typical golden parachute. PIP's payments were not necessarily conditioned upon the change in control clause. The board also designed PIP to provide bonuses to key employees over a five year period. The payments were to be deferred until the fifth year, and paid only if the recipient remained with Southwest. Unlike most golden parachutes, therefore, Southwest was to make the PIP payments irrespective of a change in control.

Southwest's board intended PIP's unique structure to assure that the corporation would receive two primary benefits[32] regardless of an actual change in control. First, Southwest intended to retain its key management employees during a volatile period marked by numerous banking mergers. The board realized that these management employees were highly successful in the past, and desired to utilize their skills in the uncertain five year period ahead, when the company may be sold. Second, the board believed PIP's structure would assure Southwest that these employees would continue to act in the corporation's best interest. If faced with a buyout, the board believed PIP assured that these employees could arrange a fair deal. If the company remained independent, the board believed PIP would guarantee that this management group would continue making Southwest a highly profitable venture.

Of utmost importance here is the fact the Southwest actually received these benefits.

**29.** Our test of reasonable relationship differs from that proposed by other commentators. One commentator advocates that a court should examine both the contents and coverage of a golden parachute. Note, *Golden Parachutes*, 94 Yale L.J. at 925–928. This commentator argues that a golden parachute must contain three central components: (1) a change in control clause; (2) a termination clause, and, (3) a compensation clause. *Id.* at 925–926. If a parachute does not contain all three, the compensation plan should fail. *Id.* At least one court has followed this guidance. *See Orin v. Huntington Bancshares*, 18 Sec.Reg. & L.Rep. (BNA) 1719 (Ohio Ct.C.P. Sept. 30, 1986).

**30.** We do not believe that the federal tax standard for reasonableness of golden parachutes should be the standard for corporate waste under Florida corporate law. The Deficit Reduction Act of 1984, Pub.L. No. 98–369, section 67, 98 Stat. 494, 585–87 (codified at I.R.C. sections 280G, 4999 (Supp. III 1985)) imposes significant tax penalties on both providers and beneficiaries of golden parachutes when the present value of a parachute exceeds three times the beneficiary's average annual salary. A "three times" ceiling would necessarily hinder a board's range of choices. Conceivable corporate reasons could legitimize a golden parachute in excess of "three times" annual salary. Accordingly, the "three times" federal tax requirement should be a guiding factor in determining waste rather than an absolute rule.

**31.** Normally, a challenging shareholder has the burden of proving a breach of a fiduciary duty under the business judgment rule. International is not a challenging shareholder. The parties in the district court stipulated that the appellees had the burden of proof on the loss issue and International had the burden of the exclusion issues. Accordingly, International has the burden of proof under the business judgment rule.

**32.** A corporation may receive two other benefits through the enactment of golden parachutes. The first would be a bona fide takeover defense. *Unocal Corp. v. Mesa Petroleum Company*, 493 A.2d 946, 957 (Del.1985). The second would be the attraction of executives to industries with high displacement risks. Note, *Golden Parachutes*, 94 Yale L.J. 909, 917–918 (1985); *see also Gaillard v. Natomas Co.*, 208 Cal.App.3d 1250, 256 Cal.Rptr. 702 (1989).

As the district court noted, the management group remained intact until the merger. Moreover, this management team helped negotiate an acquisition agreement that the shareholders overwhelmingly approved.

These two benefits were, indeed, substantial. Southwest faced serious threats of losing its highly successful management team. Southwest needed a plan that would eliminate this problem so that the phenomenal growth of Southwest could continue. Moreover, the circumstances surrounding the board when it enacted PIP created incentives for the company's key executives to perform less successfully than in the past. Accordingly, Southwest needed a system to assure the management's full devotion. PIP was established to achieve these goals.

The creation of a bonus system to retain key employees is a proper corporate purpose. *See, e.g., Kerbs v. California Eastern Airways, Inc.*, 90 A.2d at 655. Generally, these bonus systems assure that key employees will forgo other employment opportunities and remain with the company. *See Worth v. Huntington Bancshares*, 18 Sec.Reg. & L.Rep. (BNA) 1719 (Ohio Ct.C.P. Sept. 30 1986); *see also, Royal Crown Cos. v. McMahon*, 183 Ga.App. 543, 359 S.E.2d 379 (Ga.Ct.App.1987) (finding continued performance under a termination at will contract furnishes sufficient consideration).

To determine whether a plan assures that an employee will stay with the company we must examine some of the generic factors that influence an executive's choice of employment.[33] As with most professionals, a corporate executive chooses employment for both economic and noneconomic reasons. *See Koenings v. Joseph Schlitz Brewing Co.*, 377 N.W.2d 593, 601–03 (Wis.1985); see also Note, *Platinum Parachutes: Who's Protecting The Shareholder*, 14 Hofstra L.Rev. 653, 668–669 (1987). On the economic side, the executive considers salary and vacation pay, *Koenings*, 377

N.W.2d at 601, as well as corporate perks, like medical benefits, company automobile and travel. From the noneconomic perspective, the executive cogitates issues like prestige of the firm, the amount of decision-making authority, degree of professional respect, job security, and career advancement. *Koenings*, 377 N.W.2d at 602–03.

A corporation always desires to have a talented and specialized management. An efficient and profitable management depends upon specialized executives. To become specialized, executives must acquire firm-specific knowledge. To gain this knowledge, executives must expend human capital learning the day to day operations of the firm. Generally, the longer an executive remains with a company the more firm-specific knowledge that executive acquires. Loyal executives, therefore, become increasingly specialized as time passes resulting in the corporation's management becoming more efficient.

An executive payment plan incorporating only economic incentives would not suffice to secure specialized executives. These compensation plans ignore the executive's desires for career advancement or job security. Executives would then naturally desire to move to a firm that offered such securities, or one that supplied a better economic package. The employee, therefore, would lose the desire to acquire firm-specific knowledge, for this type of wisdom, by its very nature, is not readily transferable to another company. *See* Note, *Golden Parachutes and The Business Judgment Rule: Toward A Proper Standard of Review*, 94 Yale L. at 917 (1985). The end result for the corporation necessarily would be non-specialized executives, and, thus, less efficient management.

If, however, a firm added noneconomic incentives to the compensation package, the executive would be more willing to acquire firm-specific knowledge. Incentives such as career advancement and job security would add a degree of permanen-

---

**33.** The general motivating factors that attract an executive to a firm also provide the basis for the executive's decision to remain with that compa-

ny. Only the specific incentives within these factors change during the course of employment.

cy. Executives would look toward the firm as a career and be hesitant to leave for another company. The incentive to become specialized and move up the corporate ladder becomes real. The corporation providing both economic and noneconomic incentives for its executives would acquire and retain specialized employees, and, thus, an efficient and profitable management.

The mere fact of creating such a compensation plan, however, may be insufficient to retain qualified executives. To prevent another company from recruiting a key employee, a corporation must review and update their executive compensation plan. Corporations always look for a successful executive. Corporations, therefore, are willing to "raid" another firm to acquire an executive. The impetus for the raid is usually increased incentives. By offering more money or career incentives, companies hope to lure successful individuals to its door.

To ease the threat of a management raid, a corporation must compensate its successful executives at labor market levels. A bonus system is a convenient manner to achieve this goal, for such a compensation plan often includes both economic and noneconomic incentives. A bonus may be a cash payment, or a stock warrant, or a profit-sharing plan. Accordingly, the bonus system allows the corporation to mix and match economic and noneconomic incentives so the compensation package rapidly adjusts to labor market levels.

When viewed in this light, PIP would have eliminated this threat if Southwest was not taken over. PIP was to provide additional compensation to eight key executives. A disinterested compensation committee considered PIP's economic incentives sufficient to dissipate the departure temptations that these individuals would have faced over the next five years. After considering that Southwest's previous five year bonus system kept the management team in place, PIP most likely would have eliminated the threat of an executive raid.

A corporation facing an imminent takeover has other departure worries. When a corporation that has created both economic and noneconomic incentives for its executives confronts the high probability of a takeover, a separate incentive for the executive to leave arises. With the threat of takeover comes the possibility of displacement from the company. Note, *Golden Parachutes and The Business Judgment Rule: Toward A Proper Standard Of Review*, 94 Yale L.J. 909, 916 and 916 n. 39 (1985). Naturally, threats to both the economic and noneconomic incentives to remain arise. On the economic side, the executive faces the loss of his salary, retirement benefits, vacation pay, and other advantages. *Koenings*, 377 N.W.2d at 601. From the noneconomic perspective, the executive's job security is threatened, as well as career advancement commensurate with seniority and skills, marketability, professional respect, and satisfaction of working at a prestigious company. *Koenings*, 377 N.W.2d at 602–03. The executive believes he can avoid most of the loss in the economic incentives and some of the loss of the noneconomic stimuli by leaving before actual displacement. The executive then will look for another job before a buyout occurs.

The executive's incentive to leave in the takeover context becomes readily apparent through a neoclassical economic analysis. The executive perceives a disequilibrium between the value of his or her services and the expected value of the compensation received in exchange. Note, *Golden Parachutes and The Business Judgment Rule: Toward A Proper Standard of Review*, 94 Yale L.J. 909, 916 (1985). The executive's compensation is the sum of the economic and noneconomic incentives. The executive's expected value of this compensation is a function of the amount of consideration and the certainty that it will be received. *Id.* at 916 n. 42. In a company facing a high probability of a buyout, the certainty of the rewards from these compensation incentives becomes less. *Id.* The employee faces a loss of economic compensation and a frustration of the noneconomic benefits. *Id.* Accordingly, the expected value of the executive's compensation package falls. At the same time, the value of the services the executive performs remains constant.

The employee remains performing his or her appointed tasks for the firm. Disequilibrium between the value of services performed and the expected value of the compensation received results. The executive, therefore, has an incentive to increase the expected value of his or her compensation (and, thus, restore equilibrium) by seeking employment elsewhere. *Id.* at 916.

Aside from potentially losing the executive during these unstable times, the corporation faces another problem. As noted above, the threat that causes the executive to contemplate leaving also makes the executive less desirable of gaining firm-specific knowledge. Even if that employee does not leave because a takeover never occurs the acquiring of firm-specific knowledge would be retarded. The executive would take longer to specialize, resulting in less long-term efficiency for management.

Golden parachutes help offset these problems. The golden parachute shifts the risk of displacement from the executive to the corporation. Note, *Golden Parachutes and The Business Judgment Rule: Toward A Proper Standard Of Review*, 94 Yale L.J. 909, 914 (1985). The plan's payment is intended to compensate the executive for most of the economic loss and some of the noneconomic loss associated with forced departure.[34] The executive, therefore, remains at ease. He or she continues to acquire firm-specific knowledge, and the

management team remains efficient and profitable.[35]

As a golden parachute, therefore, PIP helped eliminate the short-term departure threat caused by an imminent takeover. PIP provided compensation designed to cover displacement costs in the event of a buyout. A disinterested compensation committee believed the PIP payments would cover all necessary losses that would effect to the economic and noneconomic incentives. The design worked, for the management team remained intact until the merger was consummated.

Southwest benefited from PIP in another important respect. In providing further assurances that Southwest executives would act in the corporation's best interests,[36] Southwest necessarily reduced its monitoring costs.[37]

All corporations necessarily incur monitoring costs. Jensen & Meckling, *Theory of The Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J.Fin.Econ. 305, 308 (1976); Note, *Golden Parachutes and The Business Judgment Rule: Toward A Proper Standard of Review*, 94 Yale L.J. 909, 915 n. 36 (1985). Because managers generally do not own the corporations they run, their interests may be contrary to the stockholders. Note, *Golden Parachutes*, 94 Yale L.J. at 914–915. Accordingly, management may avoid corporate action because of personal

34. The payment reflects economic loss, like salary forgone, as well as some of the noneconomic loss, like prestige and marketability. The payments often replace the reduction in prestige and marketability, for large payments, which must be disclosed under the federal securities laws, *see* 15 C.F.R. § 299.402(e) (1986), indicate to the business environment the relative importance of the executive's previous position. Of course, the analysis necessarily applies only to executives not "important" enough to remain in the new organization.

35. The golden parachute also restores the equilibrium in the neoclassical economic model. The golden parachute restores the executive's expected value of the compensation package to the level equaling the value of the services provided.

36. A failure of consideration due to a pre-existing duty is not present in the golden parachute

context. The performance of an action one is already legally obligated to do cannot support a promise. *See generally, Henderson v. Kendrick*, 82 Fla. 110, 89 So. 635 (Fla.1921). If a golden parachute was designed to assure performance in accord with fiduciary duties, the plan would fail for lack of consideration. A golden parachute, however, provides additional, *bona fide* benefits to the corporation. Aside from retaining valuable executives during a volatile time, the golden parachute helps reduce monitoring costs during the takeover threat. *See infra* p. 1466. Performance that differs from what was previously due is sufficient consideration to support a separate promise. *Greenfield v. Millman*, 111 So.2d 480 (Fla. 3d DCA 1959).

37. Corporations desire to minimize monitoring costs, which are termed "agency costs" in neoclassical economics. *See* Jensen & Meckling, *Theory of the Firm*, 3 J.Fin.Econ. 305, 308 (1976).

benefit even though the action may be beneficial to the stockholders. *Id.* The corporation, therefore, necessarily incurs monitoring costs—the expenses that arise from management potentially not acting in the best interests of the company.[38] *Id.*

Golden parachutes necessarily reduce these costs. By easing the fears of displacement, the directors would not oppose a takeover just to protect their personal interests. The directors, realizing that the corporation would ease their disassociation losses, could concentrate on a takeover offer from the perspective of fairness and optimality to the corporation. The corporation, therefore, would not incur additional monitoring costs.[39]

This conclusion, however, is not without its critics. The most significant criticism maintains that golden parachutes actually increase monitoring costs. Note, *Golden Parachutes: Untangling the Ripcords*, 39 Stan.L.Rev. 955, 967–8 (1987). This position believes golden parachutes create a risk that management may, in their desire to collect their golden parachute benefits, violate their fiduciary duties. *Id.* at 967. A corporation, therefore, necessarily incurs additional monitoring costs by enacting golden parachutes.

Essentially, this argument considers golden parachutes as insurance for displacement and advocates the problem of moral hazards. The moral hazard of insurance is that one has less incentive to take care because he or she is insured. R. Posner, *Economic Analysis of Law*, 150 (3d ed.1986). In the golden parachute context, two potential moral hazards are presented: (1) the executive has more incentive to approve a less optimal merger, and, (2) the executive will be rewarded for turning a healthy company into a takeover target. Note, *Untangling the Ripcords*, 39 Stan.L. Rev. at 967–968. This argument maintains that these moral hazards give rise to the additional monitoring costs. We disagree.

Most likely, a manager would not orchestrate an improvident merger. Note, *Untangling The Ripcords*, 39 Stan.L.Rev. at 968. If he or she did, a violation of a fiduciary duty of care would result, and civil liability would arise. *Id.* Moreover, the manager's value in the job market would decrease, for the manager's professional reputation in the business community would be blemished.[40] *Id.* In addition, the fact that an "improvident" merger was approved by the shareholders, which is required in Florida, *see* Fla.Stat.Ann. section 607.221 (West 1977), would seem to indicate that the merger was not actually unwise.

Similarly, a manager would not turn a profitable company into a takeover target. Takeover targets are companies that unde-

---

**38.** These costs, from a neoclassical economic perspective, would be the actual expenses of supervising and restricting management, as well as opportunity costs presented through each corporate action. In the corporate decision-making context, opportunity costs are the real value associated with the directors adopting the most desirable alternative. To a large extent, these opportunity costs would be lost profits.

**39.** The golden parachute specifically reduces the opportunity costs aspect of the monitoring costs. In a company without golden parachutes, the directors' interests and those of the company may be diametrically opposed, as in the case of a merger very favorable to the shareholders but that will result in certain director displacement. The directors, after balancing their certain displacement losses with the potential harm arising from a refusal to approve the offer, may lean to protecting their interest and reject the merger. The opportunity cost to the shareholders from this action, that is, the difference in real value to the corporation resulting from the boards' choosing to disapprove rather than approve the merger, is necessarily high. In a company with golden parachutes, the directors' interests will be closer to those of the company. In the case of the favorable merger discussed above, the directors have little concern over displacement, and, therefore, would not risk potential civil liability by disapproving the merger. They would approve the merger, and, therefore, the opportunity cost to the corporation here is minimal.

Neoclassical economic theory reflects these directors' decisions in terms of utility functions. The board makes a decision at a point of indifference between its and the corporation's utilities. Golden parachutes change the directors' utility functions such that a point of indifference of higher utility to the corporation results.

**40.** An executive's reputation is an economically valuable asset that makes up a significant portion of his or her human capital. *See* Fama, *Agency Problems and The Theory of The Firm,* 88 J.Pol.Econ. 288, 297–98 (1980).

rachieve, resulting in low shareholder returns. *Id.* at 969 (citing empirical studies). Poor management, at least in part, causes low shareholder returns.[41] *Id.* at 970. An acquirer believes it can improve returns by changing management. *Id.* Management would not intentionally underachieve to increase takeover probability. If a manager did, the executive would have little chance of finding new employment upon discharge. *Id.* The executive's golden parachute, therefore, would have to provide enough returns to offset the financial, social and psychological costs associated with a performance the market recognizes as subpar. *Id.* Whether any board could construct a large enough golden parachute to assure this is doubtful.

Another criticism maintains that golden parachutes do not reduce monitoring costs.[42] This view advocates that "new" monitoring costs do not arise in a takeover context. This position rests upon the fact that directors always owe a fiduciary duty. The company's monitoring costs must be linked to these duties. Any additional monitoring costs designed to focus upon the directors' fiduciary duties in a takeover situation, therefore, would be superfluous.

A corporation facing a high probability of a buyout, however, incurs additional monitoring costs that are not necessarily linked to the director's fiduciary duties. As noted above, the takeover threat gives the executives an incentive to leave the company. With that incentive comes a desire to avoid acquiring additional firm-specific knowledge. The executive becomes less specialized, and management less efficient. If a takeover never occurs, the exec-

utive's continued path toward specialization is retarded. Because a buyout may never occur, a corporation necessarily incurs monitoring costs associated with this hindrance.

The enactment of golden parachutes helps reduce these monitoring costs. The golden parachute decreases the executive's incentive to leave, and, thus, his or her disincentive to become specialized. This lessening in costs is an advantage to the corporation.

PIP provided Southwest with *bona fide* benefits. The plan eliminated the executive's departure threats, and kept the management team in place until the merger. Moreover, PIP kept management operating in Southwest's best interests, and reduced the corporation's monitoring costs.

Even though Southwest benefited from PIP, PIP would still fail if the payments Southwest made in exchange were disproportionately large to offend reasonableness. As the district court found, International can only challenge the $600,000 of PIP returned to Southwest. International is not a Southwest shareholder, who would have authority to contest all the golden parachute payments. International only has standing to challenge the amount purportedly not covered by the insurance policy. This sum is the $600,000 that the directors now claim under the policy.

We, however, will not scrutinize this $600,000 in a vacuum. These monies were part of a four million dollar golden parachute. Because only $600,000 is subject to review here, we must assume that $3.4 million of PIP is reasonably proportionate

---

**41.** Low shareholder returns are primarily caused by less than optimal performance. Poor management, of course, can utilize the limited resources of the firm in an inefficient manner. Optimality, however, should not be judged exclusively from this perspective. A management team could use all the firm's resources in an efficient manner, and low shareholders returns would nonetheless exist. A reason for such a condition would be that the firm was operating in a limited context. In some circumstances, optimality can only be achieved through merger, as where regional companies combine together to operate in a larger geographical market. This type of merger would improve the economies of scale. This situation existed with

Southwest. Southwest had a very efficient management team that operated in a regional area. Landmark believed that a merger with Southwest could improve efficiency by increasing economies of scale.

**42.** Golden parachutes should not be considered as monitoring costs that arise in a takeover situation. They may be considered monitoring costs of ordinary day-to-day operations of a company. Without them, a corporation faces both the threat of poor performance and executive departure, even if the company is never acquired.

to the benefits received.[43] In light of this fact, we must determine whether an additional $600,000 made the total payments grossly disproportionate to the benefits received.

In conducting this inquiry, we are very cognizant of the fact that a disinterested PIP committee was empowered to determine both the plan's recipients and award amounts. This committee was an integral part of Southwest. Its members knew of the monumental success Southwest's management enjoyed. The committee could easily determine the precise individuals responsible for Southwest's achievements. The committee was in a unique position to ascertain the precise combination of economic and noneconomic incentives that influenced each of these executives. The committee, therefore, could properly calculate the incentives necessary to keep the key employees in place for both the short and long terms.

We are not in a better position to second guess the committee's determinations. PIP induced these executives to stay with Southwest; therefore, the intended benefits to Southwest were achieved. After considering the unique position of the PIP committee and the fact that the intended benefits were actually received, we cannot find unreasonable the disinterested committee's belief that the receipt of these benefits was worth the full four million dollars. This case, therefore, is not one where the intended services were never performed, or the benefits to the corporation were never received. *See Findanque,* 92 A.2d at 320–21. Accordingly, the additional $600,000, which was spread among eight executives potentially over a five year period, cannot be considered unreasonable in light of PIP's accomplishments.

Even though Southwest received substantial benefits in exchange for reasonable payments, PIP still would fail if the services provided were not a precondition to payment. The corporate payment must be hinged upon the providing of services.

If the executive's services did not induce the payment, the compensation plan is a corporate gift conditioned upon the happening of a fortuitous circumstance. *See Holthusen v. Edward G. Budd Mfg. Co.,* 52 F.Supp. 125 (E.D.Pa.1943); *see also Buckhorn, Inc. v. Ropak Corp.,* 656 F.Supp. 209, 233–35 (S.D.Ohio 1987).

For golden parachutes, this analysis mandates that the corporate executive's continued employment be the condition precedent to payment. To assure satisfaction of this requirement, the payments must adequately reflect expected displacement losses, for this sum is the impetus behind the executive's remaining with the company. Note, *Golden Parachutes,* 94 Yale L.J. 909, 925–926 (1985). If the payments do not reasonably reflect displacement costs, the parachute is a gift, payable upon the happenstance of a change in control.

Appellant contends that PIP is this type of gift. International notes that PIP contained neither a termination nor a setoff provision. From this perspective, PIP could not adequately reflect actual displacement costs because the plan did not account for the possibility of continued work or immediate re-employment after the takeover. International maintains that an executive who remains with the new company or finds other employment shortly after discharge has nearly to zero displacement losses. Appellant notes that if this type of executive was a PIP recipient, he or she still would receive the full award without suffering any displacement costs. Accordingly, International believes PIP did not reflect true displacement costs because many of the PIP recipients remained with Southwest after the merger. International, therefore, considers PIP to be a superfluous bonus payable upon the mere change of control in Southwest.

We disagree with the appellant's underlying premise. Essentially, International requests this court to utilize hindsight to evaluate PIP. The disinterested PIP com-

---

**43.** We specifically note that the directors in settling the derivative action did not admit fault. Our review, therefore, cannot properly assume that the directors conceded PIP to be corporate waste by settling the derivative action.

mittee necessarily considered displacement costs in a prospective nature. This corporate institution was charged with the task of determining the precise displacement losses of the chosen eight executives, without knowing the future. *See* Note, *Untangling The Ripcords*, 39 Stan.L.Rev. at 977 (1987). This committee estimated the displacement costs of these executives, possibly realizing that these losses may not be totally offset by continued, or an immediate change in, employment. After all, the economic and noneconomic incentives among firms often differ. In light of these factors, we, in our hindsight, cannot say that the PIP committee's predictions of displacement costs were unreasonable.

We do not, and need not, express an opinion about whether all golden parachutes without termination or setoff clauses are valid under Florida law. After considering the $600,000 subject to review here and the fact that a disinterested corporate institution designed PIP, we find that the estimated displacement costs are indicative of losses sustained. The mere fact of continued employment alone is not sufficient to establish that no losses of noneconomic incentives occurred. The findings of Southwest's disinterested compensation committee are entitled to deference. Because the PIP payments adequately reflected displacement costs the executive's services, and not the mere happenstance of change in control, were the precondition for the PIP payment.

In summary, PIP's terms were reasonably related to the benefits received by Southwest. Southwest benefited from PIP in two substantial manners. In addition, the retention of the services of Southwest's key executives actually triggered the payments. With these considerations, we find that PIP is not corporate waste. International, therefore, must pay the appellees for that portion of the derivative settlement pertaining to PIP.

### b. The Johns consulting agreement is not corporate waste.

■ Under the same analysis, we reach a similar result with respect to Johns' consulting agreement. As with PIP, a disinterested board, as well as a majority of Southwest's stockholders approved the consulting arrangement. Not surprisingly, therefore, a detailed analysis reveals that the consideration paid to Johns is reasonably related to the services provided.

Southwest received at least one benefit from the consulting agreement. Pursuant to the arrangement, Johns could not compete with Southwest for five years. As the district court found, the board's desire to avoid competition with Johns was well-grounded in fact, for Johns' management leadership was a large cause for Southwest's previous success. By having Johns barred from competing, Southwest eliminated a possible formidable competitor, which was a significant advantage.[44]

The payments Southwest made to secure this benefit were not unreasonable. *See Fidanque v. American Maracaibo Co.*, 33 Del.Ch. 262, 92 A.2d 311, 321 (1952). The agreement mandated that Johns not compete with Southwest for five years. In exchange, Southwest (Landmark) was to pay Johns $225,000 *per annum.* The record reveals that this amount was Johns' salary as chief executive officer for the year prior to the merger. With this understanding, we believe that the payment was reasonable, for its intent was to compensate Johns for effectively remaining unemployed. In addition, the consulting agreement's payments unquestionably induced Johns' noncompetition. Johns was to receive the $225,000 annually provided that he did not compete. The agreement's payments, therefore, were hinged upon the services provided.

The services provided pursuant to the consulting agreement were reasonably related to the payments made in exchange.

---

**44.** Southwest could have received an additional benefit from the Johns agreement. The arrangement also provided that Johns could provide consulting services to the board when asked. His leadership abilities and experience could have been of great assistance Southwest, however, never received this benefit. The record indicates that the Landmark board (into whom the Southwest board merged) never called upon Johns for help.

Southwest benefited by having reasonable payments induce the required performance. As with PIP, we do not find this consulting agreement to be corporate waste. International, therefore, must pay Johns for the loss of two and one-half years of his consulting agreement.

## CONCLUSION

The district court was correct in its finding that sums paid by officers and directors in settlement of a derivative shareholder's suit for corporate waste was a loss within the meaning of the insurance contract, not precluded by any policy exclusion. We, therefore,

AFFIRM.

COX, Circuit Judge, specially concurring:

I concur in the judgment of the court, but only because International has misconceived the issue in the case with respect to the applicability of exclusion 5(b). The majority agrees with the district court in holding that exclusion 5(b) is inapplicable because of its conclusion that *in fact* the PIP was not an instance of the appellees' "gaining ... any personal profit or advantage to which they were not legally entitled." International argues against this conclusion by asserting that, *in fact*, the PIP was an instance of corporate waste of the sort which is excluded from the policy's coverage by 5(b). The relevant inquiry, in my opinion, is not whether, in fact, the PIP was an instance of corporate waste of the sort excluded from coverage by 5(b); rather, the relevant inquiry is whether the *claim* made by the plaintiff in the underlying shareholder's derivative action was that the PIP was corporate waste of the sort excluded from coverage by 5(b). The relevant language of exclusion 5(b) is as follows:

"The insurer shall not be liable to make any payment for loss in connection with any claim made against the Insured's: ... (b) based upon or attributable to their gaining in fact any personal profit or advantage to which they were not legally entitled."

It is what the *claim* is predicated upon which determines the applicability of the exclusion. It is no more appropriate to conclude that the exclusion is not applicable because these officers and directors were entitled to the monies they received than it would be to conclude that there was no loss within the meaning of the insuring clause because there was no "wrongful act." It is the nature of the *claim* that determines both the existence of a loss within the meaning of the insuring clause and the applicability of exclusion 5(b). Exclusion 5(b) seems to be designed to exclude coverage for claims based upon a contention that an insured has wrongfully lined his own pockets with money to which he was not entitled. An argument that coverage was excluded in this case by 5(b) for some of these claims because of the nature of the *claims* made in the shareholders' derivative action would appear to have merit, and had that argument been made by International in the district court and in this court, I would have reached a different result. Because we should not create an argument for the appellant as a basis for reversing a judgment of the district court, however, I concur in the judgment of the court.