167 A.2d 442 (1961)
Joseph FORMAN, Benjamin Glassman, Samuel Berger, Dorothy Weiss and Sidney Miller, Objectants Below, Appellants,
v.
Louis CHESLER, George Gardiner, Maxwell Goldhar, M. Mac Schwebel, Lloyd Frank, Carroll Rosenbloom, Herbert L. Hutner, American Totalisator Company, Inc., and Universal Products Company, Inc., Defendants Below, Appellees, and
William Rosenfeld, Plaintiff Below, Appellee, and
Evelyn Nathan, Objectant Below, Appellee.
Supreme Court of Delaware.
January 19, 1961.
Samuel R. Russell, Jr., Morford, Young & Conaway, Wilmington, for appellants.
Irving Morris, of Cohen & Morris, Wilmington, and Milton Paulson, New York City, for plaintiff-appellee.
John P. Sinclair, Berl, Potter and Anderson, Wilmington, and Bernard Stebel, Rubin, Baum & Levin, New York City, for defendants-appellees.
SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.
*443 SOUTHERLAND, Chief Justice.
A stockholder of Universal Products Company, Inc. brought suit on behalf of the corporation to redress certain wrongs alleged to have been committed by its directors. The essential facts are these:
In March 1956 Universal's assets consisted of about ten million dollars in cash. The defendant Goldhar and three associates acquired one-third of its stock (apparently working control) at the price of $53 a share. After this acquisition Universal, at the instance of defendant Chesler, became interested in acquiring American Totalisator Company, Inc. ("Amtote"), a corporation which supplies the pari-mutuel equipment used at race-tracks. Amtote had a two-thirds interest in a "Daily Double" machine, another device used at the tracks. The other one-third interest was owned by General Register Corporation.
An attempt was made by Universal to acquire Amtote through a Mr. Lake of Messrs. Ladenburg, Thalmann & Co. He was to receive a commission of $500,000 if successful. This attempt failed.
Thereafter Chesler and defendant Schwebel, an attorney, undertook to revive the negotiations. They were successful. In April 1956 an agreement was reached for the purchase by Universal of all (or practically all) of the shares of Amtote for $10,700,000. Universal borrowed $950,000 from two banks to complete the transaction.
Concurrently with the Amtote negotiations Chesler negotiated with Weingart, the principal stockholder of General, for the acquisition of General by Universal. Amtote and General had a close working relationship, and it was highly desirable for Universal to acquire both. These negotiations were also successful, and in April 1956 an agreement was reached for the sale of all of General's stock. The price was finally set at $2,000,000 in cash. Neither Universal nor Amtote had cash available to make the payment. Chesler and his associates agreed to supply the cash and accept in payment 37,736 shares of Universal stock at $53 a share, the same price paid by Goldhar and his associates for their Universal stock.
*444 In connection with the consummation of these transactions Universal's board of directors issued to Chesler and Schwebel 50,000 five-year warrants for the purchase of Universal stock at $56 a share, each warrant being valued at $3. This was done to compensate Chesler and Schwebel for their services in the acquisition of Amtote and General. The amount had been agreed upon before Chesler and Schwebel became members of the board.
On June 1, 1956, the board also authorized the issuance, in three groups, of stock options to purchase Universal stock: (a) to Messrs. Weingart, Levy and Robinson, the operating executives of Amtote, restricted stock options to purchase 44,368 shares at $53 a share; (b) to S. M. Rumbough, employed by Amtote as president, a restricted stock-option for 5,000 shares at $60 a share; and (c) to six key employees of Amtote, options for 4,000 shares at $60 a share.
All of these transactions were subsequently approved and ratified by the stockholders.
Within a fairly short time thereafter (apparently in eighteen months to two years) the corporate enterprise began to enjoy an extraordinary prosperity. We are told that the shares of Universal have now increased tenfold in value, and the warrants and options have, of course, enjoyed a like appreciation.
In March 1958 the present suit was filed. It alleged three causes of action.
The first charge is that the warrants for the 50,000 shares were issued to the individual defendants, who were the officers and directors of Universal, for a total consideration of $5,000, and that their value was substantially in excess thereof and to the extent of the excess was a waste of assets.
The second charge is that the 37,736 shares for the acquisition of General at a value of $53 a share was a waste of assets because the market price was $66¾ a share.
The third charge is that the stock options were issued without adequate consideration.
Discovery proceedings were had, and the facts heretofore set forth were developed. Plaintiff's counsel became convinced that the probability of any recovery on behalf of the corporation was slight. A settlement of the controversy was thereafter negotiated. The individual defendants are to surrender to Universal warrants or options of the value of $500,000, and the suit is to be dismissed with prejudice.
The Vice Chancellor directed a hearing on the fairness of the settlement. Certain stockholders appeared and objected. After oral argument the Vice Chancellor permitted the objectors to propose interrogatories to the defendants. Forty-eight interrogatories were filed and answered.
On September 12, 1960, a second hearing was held. The Vice Chancellor had before him the pleadings, depositions, exhibits, and the interrogatories and answers.
The Vice Chancellor sustained the settlement as fair. He ruled that the complaints of the objectors were not convincing, and entered an order approving the settlement. One of the objectors appeals.
The objector's contentions may conveniently be considered under three headings, corresponding to the three causes of action above referred to.

1. The 50,000 shares to Chesler and Schwebel.
It is first contended that all the directors who authorized the transaction were interested, and that the ratification by the stockholders was ineffective because the notice was inadequate. Both these contentions are vigorously denied by the plaintiff and by the defendants.
We do not pause to consider them, since we are satisfied that the record contains evidence tending to support the conclusions: (a) that Chesler and Schwebel were entitled to some compensation for their *445 services in the acquisition of General (indeed, the objector's counsel seems to have admitted this below), and (b) that the amount seems to be reasonable in the light of the fact that the number of warrants and the unit price were fairly bargained for and of the fact that $500,000 had been offered Lake for services in the acquisition of Amtote.
This conclusion disposes also of the next contention, viz., that the value of the warrants, fixed at $3, should have been determined by an independent appraisal.
It is contended that because Chesler and Schwebel later transferred certain of the warrants to others, the warrants were issued in payment for services in connection with the acquisition of control of Universal. This is categorically denied, and the subsequent transfers are otherwise explained. Clearly, plaintiff's contention rests on a dubious premise.
Finally, it is contended that the subsequent rise in the market price of the stock  apparently about ten times the value fixed in the warrant  has resulted, or will result, in a waste of corporate assets to the benefit of the warrant holders and of the optionees.
The argument seems to be twofold. The first point is that the reward is so large as in itself to stamp the transaction as a waste of assets. Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385 is cited. That case involved a by-law providing for specified percentages of net profits (exceeding a certain amount) as annual compensation to the president and five vice presidents. These payments constituted compensation in addition to fixed salaries for services during each year that the by-law was in effect. After eighteen years such annual compensation had increased to the extent that in the year 1930 the president received total compensation of over a million dollars. The Supreme Court held that payments had become so large as to require a review by the courts in the interest of the company.
That case is obviously inapplicable here. It concerned the amount of compensation paid for services in each year. It was not an executed transaction, but a continuing one. Lieberman v. Becker, Del., 155 A.2d 596, also relied upon, involved "phantom" stock options, and is in some degree subject to the same distinction.
In the instant case we are concerned with stock warrants, which have nothing to do with annual compensation. Moreover, the General Corporation Law explicitly authorizes the issuance of stock options and warrants "limited or unlimited in duration". 8 Del.C. § 157; act of March 22, 1929; 36 Del.L. § 6. Whether the issuance of perpetual warrants represents a sound public policy is not for us to say. Cf. the article, "Employee Stock Options", 66 Harv.L.Rev. 1403, at pp. 1426-1427. It is clear that the statute contemplates that the warrant holder or optionee may, at least under ordinary circumstances, lawfully expect to enjoy the advantages of any future increase in value of the shares, to the same extent as if he had invested in the stock itself. And the duration of the Chesler-Schwebel warrants is only five years.
Indeed, the Rogers case is clearly inapplicable to the issuance of the Chesler-Schwebel warrants because this case is not the ordinary one of the issuance of warrants or options as incentive compensation, but involves merely a payment for an obligation theretofore incurred. If a creditor accepts stock or warrants in payment of the debt, is he not entitled to the benefit of his bargain?
But the objector appears to argue that the three groups of options above referred to are also subject to attack under the rule of Rogers v. Hill. We do not think so, at least in the absence of special circumstances not here present. What becomes of the essential purpose of a stock warrant, or option, if the grantee may not take advantage of the increase in value? In the case of officers or employees, what *446 would be left of the theory of incentive compensation if objector's contention were approved?
The objector appears to concede that if the holder exercises the option and buys the stock, the stock cannot be canceled. This concession appears to be quite inconsistent with the theory of an ex post facto review of the reasonableness of the profit made.
In any event we decline to approve a general rule in respect of stock warrants or options which would, as plaintiff's counsel correctly says, destroy the stability and value of warrants and options granted as incentive compensation.
It is quite true that the recent and rapid increase in the issuance of stock options has presented the courts with some difficult problems. See this Court's opinion in Kerbs and Haney v. California Eastern Airways, Inc., 33 Del.Ch. 69, 90 A.2d 652; 33 Del.Ch. 174, 91 A.2d 62, 34 A.L.R.2d 839 and Gottlieb v. Heyden, Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660; 33 Del. Ch. 177, 91 A.2d 57, as well as the opinion in the Beard case, infra, Sup.Ct.1960, 160 A.2d 731. See also Lieberman v. Becker, supra. And see the article "Employee Stock Options", above cited. But the existence of these problems does not justify any such rule as objector urges.
It is, of course, always possible that the warrants or options might be vulnerable to attack on the ground that at the time of issuance the directors and recipients had inside knowledge, withheld from the stockholders, which enabled them to foresee an extraordinary rise in the price of the stock. See again 66 Harv.L.Rev. 1427.
This is the objector's second contention  that the directors who authorized these warrants and options could reasonably have foreseen the remarkable prosperity that lay in the future and concealed their knowledge from the stockholders. Plaintiff and defendants reply that there is nothing whatever in the record to justify such a finding. This seems to be correct. Moreover, as the Vice Chancellor pointed out, if the "insiders" were as prescient as the objector says, they would certainly have invested heavily in Universal stock; whereas they did not do so.
We are of opinion that the plaintiff's case against the validity of the Chesler-Schwebel warrants rests on very insecure grounds.

2. The issuance of the 37,736 shares to Chesler and his associates.
This transaction is attacked on two grounds.
First, it is said that the recipients of the shares made an immediate profit of upwards of $500,000, because the stock was valued at $53 a share, whereas the market was $66¾ a share.
This market value is of June 1956. But the agreement with Chesler was made some time in April. The market quotations in early April ranged from a high of 60 on April 3 to a low of 55½ on April 10. The price of the stock appears to have been subject to a good deal of fluctuation, for after reaching a high of 67¾ on April 26 it dropped to a high of 57 on May 29.
The agreed price of 53 does not seem clearly unreasonable, in the light of the large number of shares issued to the Chesler group, the immediate marketing of which would certainly have entailed difficulty. Moreover, the price of 53 was the same price paid by Goldhar and his group, in an arms-length transaction, when they acquired their 63,000 shares of Universal a few weeks before. Finally, the shares were bought for investment, not speculation.
Thus the facts are doubtful support for objector's charge of an immediate, unlawful profit on the shares.
Second, it is contended that Universal should have borrowed the money. Plaintiff and defendants reply, first, that *447 this was a question of business judgment, and second, that Universal had no available borrowing power at the banks. There is evidence in the record supporting this second answer.
We think that the probability of a recovery under the second count is highly doubtful.

3. The stock options.
These fall into three groups.
First, the options to Weingart, Levy and Robinson. These three were the operating executives of Amtote. So important was the retention of their services that the sellers of the Amtote stock required that the stock be deposited in a voting trust and that these three men should be three of the five voting trustees. All entered into employment agreements with Universal, and the option contract itself required the optionee to remain in its employ for eighteen months, and contained a covenant forbidding the optionee to engage in any competitive business for ten years.
We see no basis for assailing the validity of these options.
Second, the Rumbaugh option, granted in connection with the contract to employ him as president; and third, the options to six key employees.
All these options were granted by a disinterested board of directors. All of them were granted with conditions and under circumstances which were such "that the corporation may reasonably expect to receive the contemplated benefit from the grant." Beard v. Elster, Del., 160 A.2d 731, 737. There is little doubt that the instant case is ruled by our decision in the Beard case.
Our conclusion is that the plaintiff below, and the objector here, would be confronted with many obstacles, legal and factual, in the trial of the issues. These obstacles are clearly serious, and their existence is sufficient to justify a settlement.
Moreover, we think the amount was sufficiently substantial to be within a range that would justify the Vice Chancellor in exercising his discretion in approving the settlement. The argument based on the supposed gross disparity between the amount demanded  about $78,000,000  and the amount to be paid, depends upon the fallacious contention that the plaintiff proved an "open-and-shut" case justifying such a recovery. As we have shown, this is simply not the fact.
We think that the Vice Chancellor rightly exercised his discretion in approving the settlement, and his judgment is affirmed.