971 So.2d 796 (2007)
Myron ORLINSKY, Appellant,
v.
Peter PATRAKA, Appellee.
No. 3D05-2002.
District Court of Appeal of Florida, Third District.
July 5, 2007.
Rehearing and Rehearing Denied January 28, 2008.
*797 Joel S. Perwin; Fowler White Burnett and Helaine S. Goodner, Miami, for appellant.
John G. Crabtree, Key Biscayne, for appellee.
Before RAMIREZ, SUAREZ, and LAGOA, JJ.
Rehearing and Rehearing En Banc Denied January 28, 2008.
RAMIREZ, J.
Myron Orlinsky appeals the trial court's final order denying his motion for judgment in accordance with a motion for directed verdict, for remittitur, or for new trial; the order on appellee Peter Patraka's motion for prejudgment interest and costs, and motion for entry of final judgment; and the amended final judgment entered in favor of Patraka. Because the evidence in the record does not support Patraka's claim regarding any of the alleged breach of fiduciary duties or majority shareholder duties owed to him by Orlinsky, we conclude that Orlinsky was entitled to a directed verdict on Count II, the breach of fiduciary duty count. We thus reverse and remand for entry of judgment in Orlinsky's favor.

FACTS

1. Orlinsky and Patraka's History and Their Agreement
Orlinsky and Patraka both worked in their father-in-law's company, Rayex Corporation, in the late 1960's. They eventually decided to open a business together, Visual Scene, Inc., in 1969, which sold non-prescription eyeglasses to retailers. They executed a written shareholder agreement, stating that they were to receive equal salaries and benefits, as well as share equally in the company's profits and losses. Patraka contends that after they were in business together for several years, they decided to forego a written agreement and instead orally agreed they would be equal partners in any venture they operated.
*798 During the next thirty years, they founded, owned and operated a number of companies together. Orlinsky and Patraka always owned an equal number of shares and always received identical compensation and benefits. Patraka handled sales, cultivated clients and negotiated contracts. Orlinsky handled the finances and the administration of the companies, including issuing stock certificates, as well as working with foreign investors. Their understanding, while running all of these companies, was always that they were equal partners in everything. In 1988, after Visual Scene lost a major lawsuit, its lender (Fleet National Bank) foreclosed on its assets and took over Visual Scene.

2. The VSI Acquisition in 1989 and VSI International
In 1989, Orlinsky approached Benny Huen, one of his closest friends, about buying Visual Scene's assets from the bank. Huen put together a group of investors, and they purchased the assets from Fleet National Bank for over $1 million and also loaned the company $900,000. The company was re-established as a new entity called Visual Acquisition Corporation, which later became Visual Scene International (VSI). Patraka and Orlinsky each received 25.83% interest of the VSI stock, and the foreign investors put together by Huen received a 43.34% interest. Orlinsky's younger brother, Marc, received 5% interest of the shares. Orlinsky and Patraka agreed they would buy out the investors and regain control and ownership of the company. In the interim, they both orally agreed to receive the same salaries. Patraka and Orlinsky never had a written partnership or shareholder agreement with respect to VSI.
In December 1989, VSI's directors and shareholders approved an amendment to VSI's Articles of Incorporation which provided that the shareholders waived all of their preemptive rights, thereby permitting any VSI shareholder to acquire additional shares of VSI. The Articles of Incorporation did not require that a shareholder inform other shareholders of a sale of their VSI shares. Patraka conceded at trial that the Articles of Incorporation did not require that he and Orlinsky own an equal number of shares.
Additionally, Orlinsky and Patraka each had a three-year employment contract with VSI, dated January 26, 1989, stating that they would each receive the same salary and benefits. That contract was superseded by another contract, under which VSI employed Patraka as president until December 31, 1992.

3. The Formation of Top Gear
In 1992, Orlinsky proposed that Huen and the foreign investors form a foreign company called Top Gear to sell eyewear and allow the U.S. shareholders to defer payment of income tax on income earned from that company. The investors would own 43.34% of the stock, Patraka and Orlinsky would each own a 25% interest, and Marc Orlinsky would own approximately 6% interest. Patraka testified that Orlinsky told him their income would be deferred until it was brought into the United States and taxes would be paid then.

4. VSI's Conversion to a Subchapter "S" Corporation
In 1995, Orlinsky and Patraka met with accountants and counsel to obtain advice regarding converting VSI from a "C" corporation to a Subchapter "S" corporation. They were advised that foreign investors could not own stock in VSI once it became a Subchapter "S" corporation. In 1996, VSI became a Subchapter "S" corporation. The foreign investors sold their VSI shares to Orlinsky, in exchange for which he transferred his 125 shares of Top Gear to the foreign investors. After this sale *799 and transfer, Orlinsky owned a 69% interest of the outstanding shares of VSI.
Patraka alleges that, without notice to Patraka, Orlinsky secretly traded his 25% interest in Top Gear to the foreign investors in exchange for their 43.34% interest in VSI. Patraka testified that he knew that the foreign investors would need to sell their VSI shares for VSI to become a Subchapter S corporation, but he thought that the shares would be evenly distributed between Orlinsky and himself. Other than the long-standing oral agreement to be equal partners, there was nothing precluding Orlinsky from exchanging his Top Gear stock for VSI stock, nor was Orlinsky required to inform Patraka of the transaction.

5. Patraka's Lawsuit Against Orlinsky
During the late 1990's, the relationship between Orlinsky and Patraka deteriorated, eventually leading to VSI's Board of Directors terminating Patraka's employment. Patraka filed suit against Orlinsky in November 1999, which consisted of a four count amended complaint that included: Count I for breach of an open-ended oral contract assuring equal ownership, compensation, and benefits; Count II for breach of a fiduciary relationship based on the alleged oral agreement, as well as a "special trust and confidence reposed by Patraka and accepted by Orlinsky in connection with their common investments" and an "agency relationship and the fact that Orlinsky was a majority shareholder in VSI and Patraka was a minority shareholder"; Count III which alleged a constructive trust; and Count IV which alleged a tortious interference with an advantageous contractual relationship. Patraka claims that it was only after the lawsuit was filed that he found out that in November 1995, Orlinsky had obtained an additional 4,334 shares of VSI stock from the foreign investors. Orlinsky denied the allegations and asserted the Statute of Frauds as a defense to the breach of contract claim.
The case was tried before a jury in March 2005. At the close of trial, Orlinsky moved for a directed verdict on all four counts. The trial court granted Orlinsky's motion on Counts I (breach of contract), III (constructive trust) and IV (tortious interference). The trial court allowed the breach of fiduciary duty claim to go to the jury. Patraka alleged that Orlinsky's fiduciary duty derived from: 1) a general fiduciary duty; 2) a fiduciary duty owed by Orlinsky as a majority shareholder to Patraka as a minority shareholder (after Orlinsky bought the additional 43.34% interest of VSI shares, which gave him majority interest); and 3) a duty owed by Orlinsky as an agent for Patraka in dealing with the foreign investors.
The jury found Orlinsky liable and awarded Patraka $4,318,248 in damages, which represented $887,000 for the value of stock (21.67% shares of VSI), and $3,431,248 for the value of salary, compensation and benefits. The trial court denied Orlinsky's motion for judgment in accordance with his motion for directed verdict, for remittitur or for new trial, and entered an Amended Final Judgment for Patraka in the amount of $6,252,216.48 ($4,318,248.00 in damages, $1,874,031.18 in prejudgment interest, and $59,937.30 in costs).

ANALYSIS
We conclude that Patraka failed to prove any of his three theories to establish a breach of fiduciary duty. The theories all were premised basically on the argument that Orlinsky had orally agreed "to be in charge of, and act on Patraka's behalf." Properly having dismissed the oral contract count, the trial court erroneously allowed Patraka to pursue basically the *800 same claim by renaming it as a breach of fiduciary duty.

1. General Fiduciary Relationship
First, with regard to a general fiduciary relationship, the requirements for a general fiduciary duty are the following:
Fiduciary relationships implied in law are premised upon the specific factual situation surrounding the transaction and the relationship of the parties. Courts have found a fiduciary relationship implied in law "when confidence is reposed by one party and a trust accepted by the other."
Capital Bank v. MVB, Inc., 644 So.2d 515, 518 (Fla. 3d DCA 1994) (citations omitted). A fiduciary relationship must be established by competent evidence, and the burden of proving such a relationship is on the party asserting it. Kislak v. Kreedian, 95 So.2d 510, 514-15 (Fla.1957).
To establish a general fiduciary relationship, "a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." Watkins v. NCNB Nat'l Bank of Fla., N.A., 622 So.2d 1063, 1065 (Fla. 3d DCA 1993). Here, the evidence in the record indicates that Patraka was not a passive beneficiary. Patraka was the president of VSI, and Orlinsky was the CEO, each with his own corporate responsibilities. They were both experienced businessmen who had started with a shareholder agreement and later intentionally had decided to forego such an arrangement.
There is no evidence in the record independent of the long-standing oral agreement that Orlinsky would act on Patraka's behalf or advise him of personal investment opportunities which became available to Orlinsky. At the time that Orlinsky purchased the additional shares of VSI from the foreign investors, there was no shareholder agreement, no written agreement with respect to VSI stock, and no preemptive rights. Patraka's claims rest solely on the oral agreement that Orlinsky and Patraka would share equally in all business opportunities. What Patraka is alleging here is a breach of an oral contract claim, based on their long-term relationship, where he claims the two men agreed, long before VSI even existed, to own the same number of shares of VSI and equally divide the shares held by the foreign investors.
Patraka relies on Doe v. Evans, 814 So.2d 370 (Fla.2002), in support of his position, but that case involved a parishioner's suit against the church for alleged sexual abuse that took place after the victim had entered into a counseling relation. The only relation between Orlinsky and Patraka, besides being brothers-in-law, was that of business associates. Patraka has not cited any case where a general fiduciary duty has been found in the context of two business associates. In sum, there was no evidence presented of a breach of any general fiduciary duty.

2. Agency Relationship
Turning next to Patraka's agency theory of liability, an agency relationship does not exist unless the principal has a right to control the operative details of the agent's work. Stoll v. Noel, 694 So.2d 701, 703 (Fla.1997). There is no evidence in the record that Orlinsky incurred a fiduciary duty regarding the acquisition of additional shares of VSI in exchange for Top Gear stock by acting as Patraka's agent in dealing with the foreign investors. There simply was no evidence presented at trial that Orlinsky accepted this responsibility. Furthermore, Patraka did not prove that he controlled or had the right to control Orlinsky's dealings with the foreign investors, *801 which is an element of an agency relationship. Goldschmidt v. Holman, 571 So.2d 422, 424 n. 5 (Fla.1990). See also Pinon v. Int'l Harvester Co., 390 So.2d 154 (Fla. 3d DCA 1980).
This theory is another attempt to retool Patraka's count for breach of an oral contract. The trial court granted a directed verdict on the breach of contract count. Patraka has not cross-appealed the directed verdict for Orlinsky entered on the breach of contract count. Thus, as a matter of law, Patraka did not establish that an agency relationship existed here, out of which would have risen a fiduciary duty.

3. Majority Shareholder Duties in a Closely-Held Corporation
We agree with Patraka that, as a majority stockholder, Orlinsky owed a fiduciary duty to Patraka as a minority stockholder. See Biltmore Motor Corp. v. Roque, 291 So.2d 114, 115 (Fla. 3d DCA 1974). But we fail to see how Orlinsky breached this duty when he purchased the additional shares of VSI stock from the foreign investors. He was not a majority stockholder at the time. There was no shareholder agreement in place and the courts will not provide one for the parties. The mere purchase of additional stock in a corporation cannot be considered a breach of any fiduciary duty.
Patraka also asserts that Orlinsky breached this duty by failing to ensure that Patraka received a shareholder distribution equal to the one distributed to Orlinsky and his family. This refers to bonuses paid in January, 2002, years after Patraka had been terminated and after Patraka had filed suit against Orlinsky. Patraka argues that because VSI had never paid bonuses before, it was really a disguised distribution to which he was entitled to one-half.
First, if this was a disguised dividend distribution, as the owner of only 25.83% of the shares, Patraka would not be entitled to one-half, as he claims he is. The holder of one share of stock is not entitled to the same dividend distribution as the holder of a thousand shares of the same stock. Furthermore, this is not a situation like in Biltmore Motor, where the majority shareholders arranged for the sale of new stock issue at a price materially less than its market value, thereby diluting the plaintiff's stock.
Most importantly, however, is that if the distribution by VSI had been an illicit transfer or distribution, the proper course of action would be for Patraka to file a shareholder derivation suit, under Florida Statute section 607.07401, alleging corporate waste.[1] A shareholder must file *802 a derivative action for breach of fiduciary duty, claiming that the payment of excessive compensation constitutes corporate waste. See Marcus v. Lincolnshire Mgmt., Inc., 409 F.Supp.2d 474 (S.D.N.Y. 2006). See also Alario v. Miller, 354 So.2d 925 (1978). Here, Patraka's claim is against Orlinsky, claiming he was entitled to the exact same compensation that Orlinsky received from VSI, even years after his termination. Patraka has not challenged the bonus paid to Orlinsky as corporate waste. Thus, this claim should have been brought against VSI in a derivative suit, such as the one Patraka brought against VSI in Broward County, Florida in 2002.[2]

4. Patraka's Termination
Patraka further claimed that Orlinsky breached his fiduciary duty as a majority shareholder in supporting VSI's termination of Patraka's employment with VSI. First and foremost, VSI terminated Patraka's employment, not Orlinsky. Thus, Patraka's claim with respect to this issue was against VSI. DeMarco v. Publix Super Markets, Inc., 360 So.2d 134 (Fla. 3d DCA 1978). Next, because Patraka was an at-will employee, Orlinsky owed no fiduciary duty to him as a majority shareholder with respect to employment or compensation. Id. And finally, even if Orlinsky had a fiduciary duty to Patraka with regard to employment, there is no evidence in the record that Patraka's termination was wrongful. In fact, the record indicates numerous legitimate business reasons for terminating Patraka's employment: Patraka lost interest in VSI and he was looking for other employment, Patraka refused to hire sales staff to increase VSI's customer base, and Patraka refused to guaranty loans because he did not want the financial exposure.
While there is no Florida case law on point with respect to the issue of a majority shareholder's alleged breach of fiduciary duty in termination of the employment of a minority shareholder or in paying unequal salaries, we find Dweck v. Nassar, 2005 WL 3272363 (Del.Ch.), cited by Orlinsky in his brief, to be persuasive. The facts are very similar to the facts before us. In Dweck, a minority shareholder sued the majority shareholder for breach of an oral shareholders' agreement and breach of fiduciary duty, where the defendant added a fifth member to the board of directors, terminated the plaintiff's employment, and appointed his nephew to manage the closely held corporation. Id. at *1. The plaintiff alleged that the parties had adhered to the terms of the oral shareholders' agreement for over ten years and that the operation of a competing business was a pretext for terminating her. Id. at *2.
The Court of Chancery of Delaware held that the contract claims were barred because the shareholders' agreement was not in writing and the court rejected the plaintiff's claim for breach of fiduciary duty. The court noted that the plaintiff's claims regarding her wrongful termination were "personal and contractual in nature and are separate from her rights as a stockholder." Id. at *6. The court went on to state, "`Fiduciary duties are not implicated when the issue involves the rights of the minority stockholder qua employee under an employment contract.'" (citations omitted). We find that the same holds true under the set of facts before us. Simply stated, Orlinsky, as a majority shareholder, *803 had no fiduciary duty to provide Patraka with continued employment, despite VSI's financial difficulties and the legitimate business reasons for terminating Patraka that were present.

CONCLUSION
For the foregoing reasons, Orlinsky was entitled to a directed verdict on Count II, the breach of fiduciary duty count. We thus reverse the trial court's amended final judgment and remand the case for entry of judgment in Orlinsky's favor on the breach of fiduciary duty count of Patraka's amended complaint. Because we are reversing and remanding for entry of judgment in Orlinsky's favor, we need not address the damages issue raised by Orlinsky in his briefs.
Reversed and remanded.
NOTES
[1] According to the United States Court of Appeals for the Eleventh Circuit in International Ins. Co. v. Johns, 874 F.2d 1447, 1461 (1989):

. . . [C]ourts do not invalidate executive compensation systems under the business judgment rule unless they constitute corporate waste. Rogers v. Hill, 289 U.S. 582, 591-92, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933). Corporate waste exists when the payment is afforded without "adequate" consideration. Michelson v. Duncan, 407 A.2d 211, 217 (Del.1979). Under the business judgment rule, adequacy of consideration is left to the sound discretion of the directors, and courts do not invalidate compensation plans so long as the compensation the executive receives bares a reasonable relationship to the services rendered. Rogers, 289 U.S. at 591-92, 53 S.Ct. at 735; Cohen v. Ayers, 596 F.2d 733, 739 (7th Cir.1979); Kerbs v. California Eastern Airways, Inc., 90 A.2d 652, 656 (Del.1952). A compensation plan passes this "reasonable relationship" test if the payment insures that the benefit provided by the services rendered will inure to the corporation. Kerbs, 90 A.2d at 657; accord, Kaufman v. Shoenberg, 33 Del.Ch. 211, 91 A.2d 786 (1952); Forman v. Chesler, 39 Del.Ch. 484, 167 A.2d 442 (1962).
[2] Furthermore, Florida Statutes section 607.08101, titled, "Compensation of directors," states, "Unless the articles of incorporation or bylaws provide otherwise, the board of directors may fix the compensation of directors." The record reflects that VSI's Board of Directors were authorized to pay Orlinsky the bonus he received in 2002 based upon his performance that led to the company's turn-around.